---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS, ET AL.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petitions for Review from the
Federal Energy Regulatory Commission

---

# OPENING BRIEF OF PETITIONER
# NATIONAL ASSOCIATION OF REGULATORY UTILITY
# COMMISSIONERS

---

James Bradford Ramsay
  General Counsel
Jennifer M. Murphy
  Dir. of Energy Policy and Sr. Counsel
National Association of Regulatory Utility
  Commissioners
1101 Vermont Ave, NW, Suite 200
Washington, DC 20005
(202) 898-1350
jmurphy@naruc.org

*Attorneys for Petitioner*
National Association of Regulatory Utility
  Commissioners

DATED: October 30, 2019

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner files this certificate regarding parties, rulings and related cases.

**Parties, Intervenors, and Amici**

The following is a list of all parties who have appeared before this Court in this appeal:

> American Municipal Power, Inc.
> American Public Power Association
> Edison Electric Institute
> Federal Energy Regulatory Commission
> National Association of Regulatory Utility Commissioners
> National Rural Electric Cooperation Association

To counsel's knowledge, the following is a list of entities that have intervened or sought to intervene in this proceeding:

> Advanced Energy Economy
> Energy Storage Association
> Environmental Defense Fund,
> Midcontinent Independent System Operator, Inc.
> Natural Resources Defense Council
> NextEra Energy Resources, LLC
> Solar Energy Industries Association
> Southern California Edison Company
> . Transmission Access Policy Study Group
> Vote Solar

To counsel's knowledge, there are no amici curiae who have appeared before this Court in this appeal.

To counsel's knowledge, the following persons and entities appeared before the Federal Energy Regulatory Commission in the underlying administrative proceedings:

Advanced Energy Economy
Advanced Energy Management Alliance
Advanced Microgrid Solutions
Advanced Rail Energy Storage, LLC
AES Corporation, The
AES Distributed Energy
AES Energy Storage, LLC
AES ES Tait, LLC
AF Mensah Inc.
Affirmed Energy LLC
Amanda Drabek
American Electric Power Service Corporation
American Public Power Association
American Municipal Power, Inc.
American Wind Energy Association
Antonio P. Anselmo
Arkansas Public Service Commission
Avangrid, Inc.
Beacon Power, LLC
Benjamin Kingston
Brookfield Renewable Energy Group
Brookfield Renewable Partners L.P.
California Department of Water Resources
California Energy Storage Alliance
California Independent System Operator Corporation
California Municipal Utilities Association
California Public Utilities Commission
Center for Biological Diversity
Central Hudson Gas & Electric Corporation
City of Anaheim, CA
City of Azusa, CA
City of Banning, CA
City of Colton, CA

City of New York, New York
City of Pasadena, CA
City of Riverside, CA
Connecticut Department of Energy & Environmental Protection
Connecticut Public Utilities Regulatory Authority
Consolidated Edison Company of New York, Inc.
Consumers Energy Company
CT Department of Energy & Environmental Protection
Dayton Power and Light Company, The
Delaware Public Service Commission
DER and Storage Developers
Dominion Resources Services, Inc.
DTE Electric Company
Duke Energy Corporation
E.ON Climate & Renewables North America, LLC
E4TheFuture
Eagle Crest Energy Company
Edison Electric Institute
Efficient Holdings, LLC
Electric Power Research Institute
Electric Power Supply Association
Electricity Consumers Resource Council
Ellison Schneider & Harris LLP
Enel Green Power North America, Inc.
Energy Storage Association
Exelon Corporation
FirstLight Power Resources Management, LLC
FirstLight Power Resources, Inc
Fluidic Energy
Fresh Energy
Genbright LLC
GridWise Alliance
Harvard Environmental Policy Initiative
Ice Energy, Inc.
Imperial Irrigation District
Independent Energy Producers Association
Indianapolis Power & Light Company
Institute for Policy Integrity, New York University School of Law
International Transmission Company, et al.

Invenergy Storage Development LLC
IPKeys Technologies LLC
ISO New England Inc.
Lyla Fadali
Magnum CAES, LLC
Manitoba Hydro
Maryland Public Service Commission
Massachusetts Dept. of Public Utilities
Massachusetts Institute of Technology
Massachusetts Municipal Wholesale Electric Company
Matthew D'Alessio
Melissa Gough
Midcontinent Independent System Operator, Inc.
Midwest Energy, Inc.
Minnesota Energy Storage Alliance
MISO Transmission Owners
Missouri Public Service Commission
Monitoring Analytics, LLC
Mosaic Power, LLC
Motorola Solutions
National Association of Regulatory Utility Commissioners
National Grid USA
National Hydropower Association
National Rural Electric Cooperative Association
New England Power Pool Participants Committee
New England States Committee on Electricity
New Jersey Board of Public Utilities
New York Battery and Energy Storage Technology Consortium
New York Independent System Operator, Inc.
New York Power Authority
New York State Electric & Gas Corporation
New York State Energy Research & Dev. Authority
New York State Public Service Commission
NextEra Energy Resources, LLC
Niagara Mohawk d/b/a/ National Grid
North American Electric Reliability Corporation
North Carolina Utilities Commission
NRG Energy, Inc.
Ohio Consumers' Counsel

Open Access Technology International, Inc.
OpenADR Alliance, Inc.
Orange and Rockland Utilities, Inc.
Organization of MISO States
Ormat Nevada, Inc.
Pacific Gas and Electric Company
Pennsylvania Public Utility Commission
PJM Interconnection, L.L.C.
Power Applications and Research Systems, Inc.
Power Supply Long Island
PSEG Energy Resources & Trade LLC
PSEG Power LLC
Public Service Commission of Wisconsin
Public Service Electric and Gas Company
Public Utilities Commission of Ohio
Quanta Technology
R Street Institute
Robert Borlick
Rochester Gas and Electric Corporation
San Diego County Water Authority
San Diego Gas & Electric Company
Schulte Associates LLC
Solar Energy Industries Association
Solar Grid Storage
SolarCity Corporation
Southern California Edison Company
Southwest Power Pool, Inc.
Starwood Energy Group Global, L.L.C.
Steffes Corporation
Stem, Inc.
Sunrun
Sustainable FERC Project
TechNet
TeMix Inc.
Tesla, Inc.
The Dayton Power and Light Company
Trans Bay Cable LLC
Transmission Access Policy Study Group
Union Of Concerned Scientists

University of Delaware
Utility Intervention Unit, New York State Department of State
Viridity Energy, Inc.
Xcel Energy Services Inc.

**Rulings Under Review**

The Federal Energy Regulatory Commission orders under review are:

1. *Elec. Storage Participation in Markets Operated by Regional Transmission Org. and Indep. Sys. Operators*, Docket Nos. RM16-23-000; AD16-20-000; Order No. 841, 162 FERC ¶ 61,127 (Feb. 15, 2018); and

2. *Elec. Storage Participation in Markets Operated by Regional Transmission Org. and Indep. Sys. Operators*, Docket Nos. RM16-23-001; AD16-20-001; Order No. 841-A, 167 FERC ¶ 61,154 (May 16, 2019).

**Related Cases**

On July 17, 2019, the Petitioner's petition for review, No. 19-1142, was consolidated with the petition for review filed by American Municipal Power, Inc., American Public Power Association, Edison Electric Institute, and National Rural Electric Cooperation Association, No. 19-1147, seeking review of the same Federal Energy Regulatory Commission orders at issue in the instant matter.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and

Circuit Rule 26.1, the National Association of Regulatory Utility Commissioners

("NARUC") respectfully submits this disclosure statement. NARUC is a

quasi-governmental nonprofit organization founded in 1889 and incorporated in

the District of Columbia. NARUC is a "trade association" as that term is defined

in Rule 26.1(b). NARUC has no parent company. No publicly held company has

any ownership interest in NARUC. NARUC represents those government officials

in the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands,

charged with the duty of regulating, inter alia, the regulated electric utilities within

their respective borders.

Respectfully submitted,

*/s/ Jennifer M. Murphy*

Jennifer M. Murphy
   Dir. of Energy Policy and Sr.
   Counsel
*Attorney for National Association of
Regulatory Utility Commissioners*

Dated: October 30, 2019

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ...................................... vii

TABLE OF AUTHORITIES .................................................. ix

GLOSSARY OF TERMS ......................................................1

INTRODUCTION ...........................................................1

JURISDICTIONAL STATEMENT ..............................................5

STATUTORY AND REGULATORY AUTHORITIES ..........................6

STATEMENT OF THE ISSUES...............................................6

STATEMENT OF THE CASE...............................................6

SUMMARY OF THE ARGUMENT ...................................10

STANDING ..............................................................12

ARGUMENT .............................................................13

    I.       STANDARD OF REVIEW ..............................................13

    II.      FERC's Orders Exceed Its Statutory Authority .................14

        A.   The Plain Language of the Federal Power Act Expressly Preserves State Jurisdiction over Local Distribution Facilities. .......................14

        B.   State Decisions about Use of State-Jurisdictional Local Distribution Facilities are not Rules Affecting Wholesale Rates. ........................18

        C.   FERC Cannot Make Decisions that Could Threaten States' Ability to Safeguard the Local Distribution Systems' Reliability and Operations.............................................................24

    III.    FERC Cannot Commandeer State Administrative Processes to Implement its Policies .........................................30

CONCLUSION..........................................................35

CERTIFICATE OF COMPLIANCE.......................................1

CERTIFICATE OF SERVICE ...........................................2

ADDENDUM .............................................................3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adirondack Med. Ctr. v. Sebelius*,                                   13
    740 F.3d 692 (D.C. Cir. 2014)

*Atl. City Elec. Co. v. F.E.R.C.*,                                    15
    295 F.3d 1 (D.C. Cir. 2002)

*Fed. Power Comm'n v. S. Cal. Edison Co.*,                            10
    376 U.S. 205, 215 (1964)

*\*FERC v. Elec. Power Supply Ass'n,*                 *1, 7, 14, 21, 23, 24, 26*
    136 S. Ct. 760 (2016)

*\*Murphy v. National Collegiate Athletic Ass'n,*         12, 30, 31, 32, 33
    138 S.Ct. 1461, 1476 (2018)

*NARUC v. DOE,*                                                        12
    851 F.2d 1424, 1425 (D.C. Cir. 1988);

*NARUC v. FCC,*                                                        *12*
    737 F.2d 1095 (D.C. Cir. 1984), cert. denied, 469 U.S. 1227 (1985)

*NARUC v. FERC,*                                                       12
    475 F.3d 1277 (D.C. Cir. 2007)

*NARUC, et al. v. ICC,*                                                12
    41 F.3d 721 (D.C. Cir 1994)

*\*Oneok, Inc. v. Learjet, Inc.,*                                     26, 27
    135 S. Ct. 1591 (2015)

*\*Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev.*
*Comm'n,*                                                             25, 29
    461 U.S. 190 (1983)

*Printz v. United States,*                                                              12, 30, 32
    521 U.S. 898 (1997)

*U.S. v. Southern Motor Carrier Rate Conference, Inc*.,                  12
    467 F. Supp. 471 (N.D. Ga. 1979), *aff'd* 672 F.2d 469 (5th Cir. 1982), *aff'd
    en banc on reh'g*, 702 F.2d 532 (5th Cir. 1983), *rev'd on other grounds*, 471
    U.S. 48 (1985)

*Va. Uranium, Inc. v. Warren,*                                                       25, 26, 29
    139 S. Ct. 1894 (2019)


**Administrative Decisions**

*Advanced Energy Economy*,
    161 FERC ¶ 61,245 (2017)

*Elec. Storage Participation in Mkts. Operated by Regional Transmission Orgs. and
Indep. Sys. Operators,*
    157 FERC ¶ 61,121 (2016)

*Elec. Storage Participation in Mkts. Operated by Regional Transmission Orgs. and
Indep. Sys. Operators, Order No. 841*
    162 FERC ¶ 61,128 (2016)

*Elec. Storage Participation in Mkts. Operated by Regional Transmission Orgs. and
Indep. Sys. Operators, Order No. 841-A*
    167 FERC ¶ 61,154 (2018)

*Enron Power Marketing, Inc., et al.*,
    103 FERC ¶ 61346, 62348 (June 25, 2003)

*Order Opting Out of Retail Customer Participating in Wholesale Demand
Response Programs*
    NCUC Docket No. E-22, Sub 418. (2010)

*Wholesale Competition in Regions with Organized Elec. Mks.,* Order No. 719,
    FERC Stats. & Regs. ¶ 31,281 (2008)

*Wholesale Competition in Regions with Organized Elec. Mks.,* Order No. 719-A,
    FERC Stats. & Regs. ¶ 31,292 (2009)

**Statutes**

5 U.S.C. § 706(2)(C)
16 U.S.C. § 824(a)
16 U.S.C. § 824(b)
*16 U.S.C. § 824(b)(1)
16 U.S.C. § 824d
16 U.S.C. § 825*l*
47 U.S.C. §410(c)
47 U.S.C. §254

**Regulations**

18 C.F.R. § 35.28(b)(4)

**Other Authorities**

William S. Scherman, Jason J. Fleischer, *The Environmental Protection Agency and the Clean Power Plan: A Paradigm Shift in Energy Regulation Away from Energy Regulators*,
    36 Energy L.J. 355 (2015)

PJM Manual 14C:  Generation and Transmission Interconnection Facility Construction,
    Revision 12, § 1.3

# GLOSSARY OF TERMS

| | |
|---|---|
| Act | Federal Power Act, 16 U.S.C. § 824 *et seq.* |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| FERC | Respondent Federal Energy Regulatory Commission |
| ISO | Independent system operator, generically |
| J.A. | Joint appendix |
| NARUC | National Association of Regulatory Utility Commissioners |
| NOPR | Notice of Proposed Rulemaking |
| Orders | Orders No. 841 and Order 841-A, collectively |
| RTO | Regional transmission organization, generically |

# INTRODUCTION

The Federal Energy Regulatory Commission ("FERC") and the States share responsibility for regulating the electricity sector as delineated in the Federal Power Act ("Act").[1] Because the Act unequivocally establishes the States' right to decide how the local distribution system is used, the Court should vacate as unlawful, FERC's declaration that States cannot prohibit local storage resources from using those facilities to reach wholesale markets.

Originally, the States regulated nearly all aspects of the electricity supply chain, from the power plants that generated the electricity to the transmission that carried the electricity from the power plants to the areas where it was needed, to the distribution systems that delivered it to the end users.[2] The States also set the rates end users paid for the electricity. But as the sector evolved, electric utilities engaged in interstate commerce, which raised jurisdictional questions ultimately resolved by the passage of the Act in 1935. The Act authorizes FERC to regulate "the sale of electric energy at wholesale in interstate commerce."[3] This includes wholesale electricity rates ("sales for resale") and any rule or practice "affecting"

---

[1] The Federal Power Act, 41 Stat. 1063, as amended, 16 U.S.C. § 791a *et seq.* The term States is used herein to refer broadly to relevant electric retail regulatory authorities ("RERRAs"), which include state public utility commissions; not-for-profit, State, municipal, and other locally owned electric utilities; and some electric cooperatives.

[2] *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 767 (2016) ("*EPSA*").

[3] 16 U.S.C. § 824(b).

such rates.[4]  But the law places beyond FERC's power, and preserves to the States

alone, the regulation of "any other sale" of electricity, including distribution and

any retail sale directly to end-users.[5]

The Act requires FERC to ensure that the rates and charges for the activities

under its jurisdiction are just and reasonable.  FERC has spent much of the 21st

Century creating FERC-jurisdictional interstate wholesale markets to promote

competition and greater efficiency among power generators and transmission

operators.[6]  Since the creation of these markets, FERC has continuously sought to

implement changes to improve them.

In the Orders on review, FERC is pursuing the laudable goal of lowering

barriers to entry for electric storage resources' participation in the wholesale

markets.  Unfortunately, in its enthusiasm to enable storage resources to participate

in the federal wholesale markets, FERC has exceeded its jurisdictional reach.  That

overreach is the basis for this appeal.

The Orders include FERC-jurisdictional storage resources located on the interstate

transmission system in the definition of the electric storage resources eligible to

participate in the wholesale markets.[7]  However, FERC also includes local storage

_____

[4]     16 U.S.C. §§ 824(b), 824e(a).
[5]     16 U.S.C. § 824(b).
[6]     Order No. 841 at P 10 (J.A. ___).
[7]     Order No. 841 at P 5 (J.A. ___).

resources that are located on distribution systems or behind a customer's distribution meter that the Act specifies are subject to state oversight.[8]  Despite the Act's express preservation of state jurisdiction over distribution facilities, FERC asserts that the States must allow local storage resources to use state-jurisdictional distribution systems to access the federal wholesale market.[9]

FERC contends that because it created a federal market, the States have no say about whether local storage resources can participate in that market.  This argument conflates FERC's authority to establish rules for its federal market with an unsupported expansion of authority to invade Congress's express reservation to the States over how state-jurisdictional distribution systems are constructed, used, and paid for.[10]  The intervening creation of a market cannot alter Congress's longstanding decision to leave undisturbed the States' jurisdiction over distribution systems.  The States have had jurisdiction and responsibility over these systems since they were first constructed, which in some cases is over a century ago.  These are local systems of wires and related equipment that deliver electricity to neighborhoods and homes.  The States remain responsible for ensuring that local distribution systems are reliably operated and reasonably funded through the retail

---

[8]     Order No. 841 at P 5 (J.A. ___).
[9]     Order No. 841-A at P 41 (J.A. ___).
[10]    *See* 16 U.S.C. § 824(a)-(b).

rates they set.  Control over the use of distribution facilities by storage resources on those systems is inextricably linked to that responsibility.

As an ardent advocate for participation in the interstate wholesale markets, FERC downplayed the real costs that the participation of local storage resources in wholesale markets could generate for some States along with other stakeholder concerns.  Fortunately, federal law enables each State to decide whether its local storage resources can participate in the retail market, the federal market, or both. The Act recognizes the axiom of governance that is at the core of our federalist system:  decision makers closest to the problems make the best decisions.  This is not an abstract or esoteric legal exercise in jurisdictional boundaries.  Decisions about distribution system infrastructure and operations, which run the gamut from assuring resiliency and reliability to properly constructed disaster recovery plans, have real, sometimes even life-threatening, impacts on consumers.  The Act recognized this and left decisions about local distribution facilities to the local decision makers, the States.

In general, FERC's goal of eliminating barriers for storage resources to participate in the wholesale markets could bring many benefits.  Having local storage resources participate in the federal wholesale markets could also be beneficial, but *only* where the States are prepared to have their local storage resources participate.  Not all States are ready to address the potentially significant

impacts and costs of, for example, the infrastructure adaptations and additional metering necessary for local storage resources to participate in wholesale markets. The States have the right and the responsibility to make these important decisions about the distribution systems and retail markets they regulate without interference.

## JURISDICTIONAL STATEMENT

On February 15, 2018, the Federal Energy Regulatory Commission issued a final rule requiring regional transmission organizations and independent system operators to create participation models to remove barriers to electric storage resources participation in their capacity, energy, and ancillary service markets based on Sections 201 and 206 of the Federal Power Act, 16 U.S.C. §§ 824, 824e. *Electric Storage Participation in Markets Operated by Regional Transmission Organizations and Independent System Operators*, Order No. 841, 162 FERC ¶ 61,127 (2018) ("Order No. 841").  The Commission denied rehearing on May 16, 2019, in Order No. 841 A, *Order on Rehearing and Clarification*, 167 FERC ¶ 61,154 ("Order No. 841-A").  On July 11, 2019, petitioner filed a timely petition for review.  This Court has subject matter jurisdiction under section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b).

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## STATEMENT OF THE ISSUES

1.  Does the Federal Power Act permit the Federal Energy Regulatory Commission to declare that state regulatory authorities cannot decide whether local electric storage resources located behind a retail meter or on the distribution system are permitted to participate in the federal wholesale markets?

2.  May the Federal Energy Regulatory Commission commandeer the States' administrative processes to implement a federal program by requiring the States to allow local storage resources located behind a retail meter or on the distribution system to use state-jurisdictional distribution facilities to access federal wholesale markets?

## STATEMENT OF THE CASE

The issue is whether FERC may require the States to permit local storage resources to use state-jurisdictional distribution facilities to access the federal wholesale market.

I.    The Federal Power Act

The Act authorized federal regulation of electricity, but limited it to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce."[11]  The States retained jurisdiction over within-state wholesale sales (*i.e.*, sales for resale), retail sales of electricity (*i.e.*, sales directly to end users), and the facilities used in local distribution or only for the transmission of electric energy in intrastate commerce.[12]  While FERC has jurisdiction over wholesale sales in interstate commerce, the agency does not have jurisdiction over storage resources located on the distribution system or behind the meter that are not engaged in wholesale sales in interstate commerce.  The States, not FERC, have jurisdiction for this subset of storage resources.

FERC defines the electric storage resources at issue in this case as "resource[s] capable of receiving electric energy from the grid and storing it for later injection of electric energy back to the grid," which includes resources located on the interstate transmission system, on a distribution system, or behind the meter.[13]  For local storage resources on the distribution system or behind the meter

---

[11]    16 U.S.C. § 824(b)(1).
[12]    16 U.S.C. § 824(b)(1); *EPSA* at 768.
[13]    Order No. 841 at P 29 (J.A. ___); Order No. 841-A at P 5 (J.A. ___).

to access the federal wholesale markets, they must use the distribution facilities over which the Act gave States jurisdiction.

## II. The Rulings Under Review: Order Nos. 841 and 841-A

In November 2016, FERC issued a Notice of Proposed Rulemaking ("NOPR") amending its regulations to remove barriers to the participation of electric storage resources and distributed energy resource aggregations in the capacity, energy, and ancillary service markets operated by the RTOs and ISOs, *i.e.*, the federal wholesale markets.[14] NARUC filed comments on the NOPR that generally supported FERC's efforts to address barriers to energy storage resources and aggregated distributed energy resources participating in wholesale markets.[15] NARUC conditioned that support on FERC acknowledging State jurisdiction to determine whether to allow resources located on the distribution system to participate in the federal markets and not adversely impacting system reliability.[16] NARUC sought confirmation that FERC would include a provision that the States could opt out of allowing resources on the distribution system to participate in the

---

[14] *Elec. Storage Participation in Mkts. Operated by Regional Transmission Orgs. and Indep. Sys. Operators*, 81 Fed. Reg. ¶ 86,522 (Nov. 30, 2016) (Docket Nos. RM16-23 and AD16-20) ("NOPR") (J.A. ___).

[15] *Motion to Intervene and Comments of the National Association of Regulatory Utility Commissioners* (filed on February 13, 2017) (Docket Nos. RM16-23 and AD16-20) at 3 ("NARUC NOPR Comments") (J.A. ___).

[16] NARUC NOPR Comments at 3 (J.A. ___).

wholesale markets, similar to FERC's treatment of demand response resources.[17]

There, FERC recognized demand response aggregators' participation in the federal wholesale markets could be limited where "the laws or regulations of the relevant electric retail regulatory authority do not permit a retail customer to participate."[18]

On February 15, 2018, FERC issued Order No. 841, a final rule that amends federal regulations to require that each regional transmission organizations ("RTOs") and independent system operators ("ISOs") ("RTOs/ISOs") revise its tariff to establish a participation model that would facilitate electric storage resources taking part in the wholesale markets.[19]  FERC did not include an opt-out provision for the States.  On March 19, 2018, NARUC and others petitioned for clarification and rehearing.  NARUC asked FERC to "clarify that the States retain

---

[17]     NARUC NOPR Comments at 3 (J.A. ___).  NARUC requested that FERC clarify that it will block aggregator participation in the markets for all distributed energy resources, not just demand response resources, where state laws or regulations prohibit such participation.  NOPR at P 157 & n.238.  FERC defines "demand response" as "a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy." 18 C.F.R. § 35.28(b)(4).

[18]     Order No. 719, 125 FERC ¶ 61,071 at P 154.  FERC Order 719 is discussed further below.

[19]     Order No. 841 at P 3 (J.A. ___).  Because the record was deficient, FERC also opened a new docket, Docket No. RM18-9-000, to explore proposed distributed energy resource aggregation reforms in the 2016 NOPR.  Order No. 841 at P 5 (J.A. ___).  FERC has not issued a final rule in that docket.

authority to determine whether resources located behind a meter or on the distribution system are allowed to participate in the wholesale markets."[20]

FERC issued Order No. 841-A on May 16, 2019, generally affirming Order No. 841 and rejecting NARUC's request for a State opt-out provision. This aspect of FERC's order was not unanimous. Commissioner Bernard McNamee's dissent said that he would have granted the rehearing solely on the state opt-out issue. NARUC and the other petitioners then filed for review.

## SUMMARY OF THE ARGUMENT

The electricity sector has evolved dramatically since the Act was enacted in 1935 and is still evolving. With the Act, "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction."[21] While many have opined since the Act was passed that this line at times seems blurry,[22] this is not one of those circumstances. Until Congress amends the Act, the line is still in the Act and easy to locate.

---

[20] *Request for Clarification and Rehearing of the National Association of Regulatory Utility Commissioners* (filed on March 19, 2018) (Docket Nos. RM16-23 and AD16-20) at 2 (J.A. ___) ("NARUC Rehearing Request"). NARUC also stated that "[a]lternatively, FERC should clarify that the determination of this jurisdictional issue is reserved for Docket No. RM18 9 000 as part of the broader discussion of States' authority to determine whether to allow aggregated market participation by all distribution level resources." NARUC Rehearing Request at 2 (J.A. ___).
[21] *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964).
[22] *See, e.g.*, William S. Scherman, Jason J. Fleischer, *The Environmental Protection Agency and the Clean Power Plan: A Paradigm Shift in Energy Regulation Away from Energy Regulators*, 36 Energy L.J. 355, 375 (2015).

When it drew its bright line between federal and state jurisdiction, Congress could not have imagined the complex wholesale markets that are operated by the RTOs/ISOs ("RTO/ISO markets" or "federal wholesale markets").  Nevertheless, which side of the jurisdictional line local storage resources are on is clear:  The States have jurisdiction over distribution facilities and the local storage resources on the distribution system or behind the meter that need to use those facilities to access the federal wholesale markets.  FERC's Orders exceed its statutory authority because they assert that local storage resources located on the distribution system or behind the meter can decide whether they will participate in the wholesale markets.  FERC also asserts that its authority over rules affecting FERC-jurisdictional rates means that the States cannot prohibit local storage resources from using state-jurisdictional facilities to participate in the federal wholesale markets.  The Act does not give FERC the authority to make these declarations; the Act reserves to the States jurisdiction over distribution facilities, which are necessary for these resources to access the wholesale markets, and retail markets.

By declaring that States cannot prohibit these local storage resources from participating in the wholesale market, FERC is requiring States to allow the resources to use the distribution facilities to access the wholesale markets.  But

federal agencies cannot command the States to administer or enforce a federal regulatory program.[23]

## STANDING

NARUC represents the interests of state utility commissions that have the duty of regulating, *inter alia*, the regulated electric utilities within their respective borders. The association has been recognized both by Congress in several statutes and consistently by Article III courts as the proper entity to represent the collective interests of the state utility commissions.[24] NARUC regularly represents its members in FERC matters, including the instant proceeding.

The issues raised by the challenged FERC Orders and the relief sought by NARUC concern federal-state jurisdictional matters that can be addressed without participation by NARUC's individual members. State utility commissions have

---

[23] *Murphy v. National Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1476 (2018) (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)).
[24] *See* 47 U.S.C. §410(c) (1971) (Congress designated NARUC to nominate members of Federal-State Joint Board to consider issues of common concern); *See also* 47 U.S.C. §254 (1996); *See also NARUC, et al. v. ICC*, 41 F.3d 721 (D.C. Cir 1994) (where this Court explains "Carriers, to get the cards, applied to . . . (NARUC), an interstate umbrella organization that, as envisioned by Congress, played a role in drafting the regulations that the ICC issued to create the "bingo card" system). *See also, e.g., U.S. v. Southern Motor Carrier Rate Conference, Inc.*, 467 F. Supp. 471 (N.D. Ga. 1979), *aff'd* 672 F.2d 469 (5th Cir. 1982), *aff'd en banc on reh'g*, 702 F.2d 532 (5th Cir. 1983), *rev'd on other grounds*, 471 U.S. 48 (1985) (where the Supreme Court notes: "The District Court permitted . . . (NARUC) to intervene as a defendant. Throughout this litigation, the NARUC has represented the interests of the Public Service Commissions of those States in which the defendant rate bureaus operate." 471 U.S. 52, n.10. *Compare, NARUC v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007); *NARUC v. DOE*, 851 F.2d 1424, 1425 (D.C. Cir. 1988); *NARUC v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1227 (1985).

the responsibility to ensure the safe, reliable, and affordable delivery of electric service to consumers. The States' ability to fulfill this regulatory duty will be adversely affected by the challenged FERC Orders. The injuries can be remedied by an order of this Court that preserves the States' jurisdiction by affirming the States' ability to continue to make important decisions regarding matters concerning distribution facilities and retail services.

## ARGUMENT

## I. STANDARD OF REVIEW

Under *Chevron*, agencies are not entitled to deference where a court, after "considering the text, structure, purpose, and history of an agency's authorizing statute," can "determine whether a provision reveals congressional intent about the precise question at issue."[25] Moreover, an agency's "interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear."[26] Finally, if an agency's action is "in excess of statutory jurisdiction, authority, or limitations," the Court must hold it unlawful and set it aside.[27]

---

[25] *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696 (D.C. Cir. 2014).
[26] *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994) (citing *Pittston Coal Group v. Sebben*, 488 U.S. 105, 113 (1988); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 & n.9 (1984)).
[27] 5 U.S.C. § 706(2)(C).

## II.    FERC'S ORDERS EXCEED ITS STATUTORY AUTHORITY

The question presented is who has the right to determine if a local storage resource located on the local distribution system or behind the meter can participate in federal wholesale markets.  FERC's Orders assert that local storage resources can decide.[28]  FERC also declares that the States cannot prohibit local storage resources from participating.  Both assertions are contrary to the division of jurisdiction between FERC and the States that Congress established in the Act.  The Administrative Procedures Act requires the Court to hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations."[29]  As discussed below, FERC's declarations fall squarely within the Administrative Procedure Act's proscription and therefore must be set aside.

### A. *The Plain Language of the Federal Power Act Expressly Preserves State Jurisdiction over Local Distribution Facilities.*

The Act divides jurisdiction over the use and sale of electric energy between FERC and the States.  FERC's jurisdiction is expressly limited to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce."[30]  FERC "may not regulate either within-state wholesale sales or . . . retail sales of electricity (*i.e.*, sales directly to users). . . . State utility commissions continue to oversee those transactions."[31]  Section

---

[28]    FERC has said that it is not forcing storage resources to participate in the interstate wholesale markets.  Order No. 841 at P 35 (J.A. ___); Order No. 841-A at P 8 (J.A. ___).

[29]    *See* 5 U.S.C. § 706(2)(C) (providing that the courts will set aside agency action taken "in excess of statutory jurisdiction").

[30]    16 U.S.C. § 824(b)(1).

[31]    *EPSA* at 768.

201(b)(1) of the Act also states that FERC shall not have jurisdiction over, among other things, "facilities used in local distribution or only for the transmission of electric energy in intrastate commerce . . . ."[32] The Act preserves state jurisdiction over local distribution facilities and, in the context of the Orders, limits FERC's jurisdiction to conditioning wholesale sales in interstate commerce.

FERC cannot expand its jurisdiction beyond what the Act provides. Unlike the States, "FERC is a creature of statute, having no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress. Thus, if there is no statute conferring authority, FERC has none. In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand."[33]

FERC's jurisdiction attaches only if and when there are wholesale sales in interstate commerce; if there are no such sales, then clearly there is no FERC jurisdiction. FERC's Orders indicate correctly that once local storage resources are allowed to participate in the interstate wholesale markets, FERC has jurisdiction over their actions in those wholesale markets, including the rules for participating in those markets.[34] Significantly, nowhere in either Order has FERC claimed that if the local storage resources do not participate in the federal wholesale markets, it has jurisdiction over the resources' purchases and sales on the distribution system or behind the meter.

The dispute is whether local storage resources located on the local distribution system or behind the meter may use distribution facilities to access the wholesale markets. A local storage resource cannot become a wholesale market participant without using such distribution facilities. The Act reserves explicitly to the States – and thus withholds from FERC – jurisdiction over these "facilities used in local distribution" that are needed for a local storage resource to access the federal wholesale markets. State jurisdiction over distribution facilities means that States, not FERC, determine whether such facilities may be used by local storage resources to access the federal wholesale markets.

In fact, in Order No. 841, FERC tries to support the Final Rule by calling attention to the fact "that numerous resources connected to the distribution system participate in the RTO/ISO markets today" and citing to an RTO/ISO market

---

[32]    16 U.S.C. § 824(b)(1).
[33]    *Atl. City Elec. Co. v. F.E.R.C.*, 295 F.3d 1, 8 (D.C. Cir. 2002) (internal citations and quotations omitted).
[34]    FERC also acknowledges state authority to prohibit a local storage resource that is participating in the federal wholesale market from participating in the retail market. Order No. 841-A at P 41 (J.A. ___).

manual, PJM's Manual 14C.[35]  This manual discusses the requirements of Wholesale Market Participation Agreements, which are only necessary to facilitate participation by distribution-level generators over which FERC *lacks* jurisdiction.[36] In its request for rehearing of Order No. 841, NARUC pointed this out and stated that such agreements "– and the market entry of generation resources thereunder – is a product of federal-state comity that should not be mistaken for an exercise of exclusive federal jurisdiction."[37]  FERC acknowledged NARUC's comments in Order No. 841-A, but did not directly respond to the obvious, *i.e.*, the fact that this need for the agreements demonstrates that FERC does not already have jurisdiction over resources on the distribution system seeking to access the federal wholesale markets.[38]  Furthermore, this lack of jurisdiction means FERC has no authority to delegate this decision to third party commercial interests, as FERC's Orders specify.  FERC's interpretation conflicts with both the explicit text and any reasonable interpretation of Section 201(b)(1) of the Act.[39]  It is, at best, incompatible with Congress's express reservation of State authority over local distribution facilities.

The decision over local storage resources' participation in federal wholesale markets is similar to a parent's decision about whether to send a child to a daycare center or care for her at home.  Parents decide this based on personal knowledge of their family's particular circumstances.  Parents understand that there are tradeoffs and that the daycare center will set the rules and routines that the child will follow while there.  They also know that a daycare center can establish criteria for enrollment that not every child can meet.

Likewise, FERC certainly can determine how its federal wholesale market operates and what criteria must be met for participation.  But, just as the daycare center has no authority over a child's routine and behavior until and unless she walks through the center's door, FERC's jurisdiction is limited in this case to sales for resale in interstate commerce.  It does not attach to the local storage resources on the distribution system or behind the meter *until and unless* the local storage resource is permitted by the State to participate in the federal market.

---

[35]     Order No. 841 at P 35 & n.56.
[36]     *See* PJM Manual 14C:  Generation and Transmission Interconnection Facility Construction, Revision 12, § 1.3 ("Generators planning to connect to the local distribution systems at locations that *are not under FERC jurisdiction* and wish to participate in PJM's market need to execute a PJM Wholesale Market Participation Agreement") (emphasis added).
[37]     NARUC Rehearing Request at 7 (J.A. ___).
[38]     Order No. 841-A at P 18 (J.A. ___).
[39]     16 U.S.C. § 824(b)(1).

Like parents, each State can decide whether federal market participation and federal oversight makes sense, given its particular circumstances. Some undoubtedly will want their local storage resources to participate in the wholesale markets, but not every State is similarly situated. Not every State has the resources to address the metering, accounting, operational, and reliability concerns associated with local storage resources on the distribution system participating in the interstate wholesale markets. Even FERC concedes that it will be complex, but still feasible, to develop the accounting practices to delineate between wholesale and retail activities necessary to address concerns raised by parties such as the Maryland and New Jersey public utility commissions.[40] FERC also recognized that

> it may be beneficial for each RTO/ISO to coordinate accounting requirements in cooperation with the distribution utilities and relevant electric retail regulatory authorities in its footprint to help identify workable accounting solutions for distribution-interconnected or behind-the-meter electric storage resources to participate in the RTO/ISO markets.[41]

This assumes, however, that every State has the resources to engage meaningfully in those activities while maintaining the capability to ensure safe, reliable, and affordable service.

---

[40]   Order No. 841 at P 319, 323, 324 (J.A. ___).
[41]   Order No. 841 at P 324 (J.A. ___).

Just as the decision about childcare is best made by parents who know the child's needs and the family's circumstances and resources, a decision about the participation of local storage resources is best made by the governmental entity that knows the needs and particular circumstances of the distribution system it is charged by Congress and State law to oversee – a local decision made by local decision makers.

### B. State Decisions about Use of State-Jurisdictional Local Distribution Facilities are not Rules Affecting Wholesale Rates.

FERC improperly relies on its authority over rules affecting FERC-jurisdictional rates to assert that the States cannot prohibit local storage resources from using state-jurisdictional facilities to participate in the federal wholesale markets. While FERC argues that Sections 205 and 206 of the Act "provide the Commission with jurisdiction over all rules, regulations, practices, or contracts affecting jurisdictional rates, charges, or classifications,"[42] the plain language of the statute does not support FERC's argument. Section 205(a) of the Act states that:

> All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be

---

[42] Order No. 841-A at P 32 (J.A. ___).

> just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.[43]

The "such rates or charges" over which FERC can prescribe "rules and regulations" clearly refers to "[a]ll rate and charges" that are "subject to the jurisdiction of [FERC]." FERC's authority under this statute is expressly limited to that which is "subject to the jurisdiction of [FERC]."

FERC therefore cannot rely on this authority to expand its jurisdiction into the States' jurisdiction. FERC nowhere claims that it has jurisdiction over local storage resources that do not participate in the wholesale markets, nor could it credibly do so.[44] By definition, there are no rates or charges subject to FERC's jurisdiction unless and until the State authorizes use of state-jurisdictional distribution facilities to permit a distribution resource to participate in wholesale markets. FERC's jurisdiction cannot attach *until after* the decision to participate in the wholesale market has occurred. A rule or regulation about that decision therefore does not constitute a rule or regulation affecting or pertaining to whether FERC-jurisdictional rates and charges are just and reasonable.

FERC's Orders argue that its ability to establish criteria for participation for local storage resources without regard to state jurisdiction "is essential to the

---

[43]    16 U.S.C. § 824d.
[44]    Order No. 841-A at P 41 (J.A. ___).

Commission's ability to fulfill its statutory responsibility to ensure that wholesale rates are just and reasonable."[45]  This statement makes no sense because of another aspect of the Orders.  At the same time FERC claims participation of local storage resources in wholesale markets is essential to assure just and reasonable rates – it does not mandate participation.

FERC concedes it is not going to force local storage resources to participate in the wholesale market to ensure just and reasonable rates.[46]  If it is not forcing these resources to participate, FERC necessarily concedes that FERC-jurisdictional rates will be just and reasonable even if local storage resources do not participate.  Therefore, the rates should still be just and reasonable regardless of the reason storage resources may not participate, *e.g.*, that they are prohibited from doing so by state law.

In fact, FERC has defined storage resources that are eligible to participate in the interstate wholesale markets as those that, in addition to being physically able to inject electric energy back on to the grid, are "contractually permitted to do so (*e.g.*, per the interconnection agreement between an electric storage resource that is interconnected on a distribution system or behind-the-meter with the distribution

---

45      Order No. 841-A at P 31 (footnote omitted) (J.A. ___).
46      Order No. 841 at P 35 (J.A. ___).

utility to which it is interconnected)."[47]  This is an express concession by FERC

that it lacks jurisdiction over such contracts.  Those contracts, like the use of the

distribution facilities to connect distribution-level storage resources to the

wholesale market, also fall outside of FERC's "jurisdiction over all rules,

regulations, practices, or contracts affecting jurisdictional rates, charges, or

classifications."[48]

In attempting to expand its authority beyond the statute's clear limits, FERC

relies heavily on the Supreme Court's opinion in *EPSA*.  Such reliance is

misplaced, and undermined by: (i) Order No. 745, the FERC decision reviewed in

*EPSA*; and (ii) Order No. 719, a prior, foundational FERC decision.  The issue in

*EPSA* was not whether FERC had jurisdiction over the decision to allow demand

response resources to participate in wholesale markets or whether States should be

allowed to opt out; rather, the "practices at issue" in that case were wholesale

"market operators' payments for demand response commitments" as set forth by

Order No. 745.[49]  Order No. 745 builds upon Order No. 719, which explicitly

recognize the States' right to prevent demand response resources from

---

[47]     Order No. 841-A at P 8 (J.A. ___); Order No. 841 at P 33 (J.A. ___) (italics added).
[48]     Order No. 841-A at P 32 (J.A. ___).
[49]     *EPSA* at 773.

participating in the federal wholesale markets.[50] With the States' opt-out provision already in place, the issue of compensation concerned only resources that had been permitted to participate in the wholesale markets. In determining that FERC was not attempting to regulate retail sales with its compensation scheme, the *EPSA* opinion emphasized that Order No. 745 "addresses–and addresses only–transactions occurring on the wholesale market."[51]

Indeed, the *EPSA* opinion supports a plain reading of the Act, which gives States the final word regarding the use of their local distribution facilities. The *EPSA* opinion recognized that Order No. 719 requires, among other things, "wholesale market operators to receive demand response bids from aggregators of electricity consumers, *except when the state regulatory authority overseeing those users' retail purchases bars such demand response participation.*"[52] In fact, this aspect of the demand response program was part of the Court's reasoning to uphold Order No. 745:

> Wholesale demand response as implemented in [Order No. 745] is a program of cooperative federalism, in which the States retain the last word. That feature of [Order No. 745] removes any conceivable

---

[50]   Order No. 719, 73 Fed. Reg. 64119, P 154.
[51]   *EPSA* at 776.
[52]   *EPSA* at 771, *citing* Order No. 719, 73 Fed. Reg. 64119, P 154 (codified 18 CFR § 35.28(g)(1) (2015)) (emphasis added). The Court also noted that no party had sought judicial review of Order No. 719. *Id.*

doubt as to its compliance with § 824(b)'s allocation of federal and state authority.[53]

Unlike the issue in *EPSA*, where FERC and the Court recognized that the States "retain the last word," FERC's Orders here give the States no say regarding the use of their jurisdictional facilities.  In so doing, FERC infringes on state authority expressly preserved by the Act.  FERC confuses its authority to determine the criteria and rules in the interstate wholesale markets with the authority to determine whether the storage resources can participate.

To be clear, *EPSA* <u>does</u> support FERC's authority to determine *how* resources participate in the wholesale markets once they are part of that market, because the Court held that FERC had the authority to determine how wholesale market prices were set.  However, the opinion <u>does not</u> support FERC's argument now that States cannot determine *whether* resources participate in the wholesale markets.  FERC misreads the Court's holding that FERC has the authority to determine a compensation scheme for a certain group of resources participating in the wholesale markets.  FERC expands that holding to reach a conclusion the Court did not make:  that FERC can override the States' authority to decide whether these local resources located on the distribution system or behind the

---

[53]     *EPSA* at 780.

meter may participate in the federal wholesale markets. That conclusion finds no support in the text of the Act or the *EPSA* decision.

### C. FERC Cannot Make Decisions that Could Threaten States' Ability to Safeguard the Local Distribution Systems' Reliability and Operations.

As delineated in the Act, the States have authority over, and responsibilities for, the local distribution system with which FERC cannot interfere. In Order No. 841, FERC acknowledges

> the ongoing, vital role of the states with respect to the development and operation of electric storage resources. Such state responsibilities include, among other things, retail services and matters related to the distribution system, including design, operations, power quality, reliability, and system costs.[54]

FERC adds that nothing in Order No. 841 "is intended to affect or implicate the responsibilities of distribution utilities to maintain the safety and the reliability of the distribution system or their use of electric storage resources on their system."[55] Yet, it does. FERC specifies that local storage resources must comply with States' rules "assuming that such rules do not conflict with the requirements of Order No. 841 (*e.g.*, by placing a broad prohibition on participating in the RTO/ISO

---

[54] Order No. 841 at P 36; ?? (J.A. ___).
[55] Order No. 841 at P 36 (J.A. ___).

markets)."[56]  As discussed above, however, there can be no jurisdictional conflict, because FERC lacks jurisdiction *until* and *unless* there are wholesale sales by local storage resources.

Moreover, "federal regulation of certain activities does not mean that States must authorize activities antecedent to those federally regulated.  For example, federal regulation of nuclear powerplants does not demand that States allow the construction of such powerplants in the first place."[57]  In *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Commission*, the Supreme Court held that a state law conditioning construction of nuclear plants on determination by a state agency that there were adequate storage facilities and means of disposal available for nuclear waste was not pre-empted.[58]  The Court determined that despite federal statutes and policies promoting nuclear power, "the promotion of nuclear power is not to be accomplished 'at all costs.'"[59]  In that case, Congress allowed the States to determine whether such plants should be built for economic reasons. The Court found that reservation left the States sufficient authority to slow or stop the development of nuclear power.[60]  Here, it is clear

---

[56]     Order No. 841-A at P 62 (italics added) (J.A. ___).
[57]     *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1916 (2019) (Ginsburg, J., concurring), *citing Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n.*, 461 U.S. 190, 222 (1983).
[58]     *Pacific Gas* at 194
[59]     *Pacific Gas* at 222.
[60]     *Pacific Gas* at 223.

Congress left the jurisdiction of distribution facilities with the States. Simply because FERC regulates the wholesale markets does not mean that States must authorize local storage resources to use the distribution facilities necessary to access the wholesale markets. In this situation, if a State were to disallow such participation, "it has prohibited only an antecedent activity subject to exclusive state authority."[61]

It is also clear that FERC lacks any authority to block the States from issuing broad prohibitions against local storage resources participating in federal wholesale markets. In examining whether a state law was pre-empted in the "similarly structured world of natural gas regulation," the Supreme Court in *Oneok, Inc. v. Leerjet, Inc.*, found that the "precedents emphasize the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted."[62] If the aim of the state regulation is "firmly on the States' side of that dividing line," even if "the regulation might have affected the costs of and prices of interstate wholesale sale, *i.e.*, jurisdictional sales," then the state regulation is not pre-empted.[63]

---

[61]     *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1916 (2019) (Ginsburg, J., concurring).
[62]     *EPSA* at 776; *Oneok, Inc. v. Leerjet, Inc.*, 135 S. Ct. 1591, 1599 (2015).
[63]     *Oneok, Inc. v. Leerjet, Inc.*, 135 S. Ct. at 1600 (italics added).

The States regulate matters related to the local distribution systems, including those facilities' construction, reliable operation, and cost recovery from customers. The States could, for example, lawfully require that resources on the distribution system or behind the meter participate only in the retail market to ensure reliability or to ensure that the system is reasonably funded. These are legitimate policy goals that the States have pursued since distribution systems were constructed roughly a century ago. The aims of a state regulation to maintain reliability or to ensure that system costs are reasonable and appropriate are about the functioning of the retail market. The functioning of a retail market is "firmly on the States' side of that dividing line."[64]

FERC seems to argue that such a regulation is beyond the States' jurisdiction because, in FERC's view, it would be "aimed directly" at the wholesale markets.[65] However, FERC casts its net too wide. FERC's jurisdiction is over the functioning of the wholesale market for resources that can and do participate, not the decision about whether a local resource can participate. It is clear that what FERC contends would be States aiming directly for the wholesale markets is really just the States continuing to exercise the same jurisdiction over the distribution systems they have exercised for more than a century.

_____

[64] *See Oneok, Inc. v. Leerjet, Inc.*, 135 S. Ct. at 1600.
[65] Order No. 841-A at P 48 (J.A. ___).

The States need to exercise jurisdiction because local storage resources participating in the wholesale markets might well have a negative impact on the distribution systems.  In a declaratory order regarding the participation of energy efficiency resources in the federal wholesale markets, FERC declared that States, without express authority from FERC, could not opt out of having their energy efficiency resources participate.[66]  However, in so doing, FERC distinguished between allowing States an opt-out provision for demand response resources in Order Nos. 719/719-A and not allowing one for energy efficiency resources. There, FERC stated that "[u]nlike demand response resources, [energy efficiency resources] are not likely to present the same operational and day-to-day planning complexity that might otherwise interfere with [a Load Serving Entity's] day-to-day operations."[67]

FERC cites this declaratory order as factual support for its decision to reject requests to explicitly provide for a state storage resources opt-out provision. However, FERC's reasoning in distinguishing energy efficiency resources from demand response resources runs counter to its conclusion regarding storage resources, which highlights the reasons why the States need to retain authority to block storage resources from the wholesale market.  It is clear that, unlike energy

---

[66]     *Advanced Energy Economy*, 161 FERC ¶ 61,245, at PP 59-61 (2017) ("*AEE Order*").
[67]     *AEE Order* at P 63.

efficiency,[68] local storage resources do "present operational and day-to-day planning complexity" that might interfere with day-to-day operations.

FERC defines local storage resources eligible to join the wholesale markets as resources capable of injecting electricity back into the electric system used to serve customers.[69] Unlike energy efficiency resources, and even demand response resources, these local storage resources have an exponentially higher likelihood of raising operational and day-to-day planning complexities that could interfere with a distribution utility's day-to-day operations. Moreover, it is clear these resources raise reliability and system cost issues, *precisely because* they inject electricity back onto the system. To prevent local storage resources from causing such issues, some States may need to prohibit them from participating in the wholesale markets. Just as the Supreme Court found in *Pacific Gas* that "[p]romotion of nuclear power is not to be accomplished at all costs," promotion of the federal wholesale markets also should not be accomplished at the expense of the reliability and stability of local distribution systems.[70]

_____

[68]    Energy efficiency resources include, for example, programs to provide partial rebates for customers who purchase energy-efficient appliances.
[69]    Order No. 841 at P 5 (J.A. ___).
[70]    *Va. Uranium* citing *Pacific Gas* (139 S. Ct. 1894, 1908, 1915).

29

## III. FERC CANNOT COMMANDEER STATE ADMINISTRATIVE PROCESSES TO IMPLEMENT ITS POLICIES

For local storage resources on the distribution system or behind the meter to access the federal wholesale markets, they must use the local distribution facilities that are regulated by the States. FERC's Orders require the States to allow local storage resources to use distribution facilities to access those markets.[71] FERC cannot order the States to do this: the "Federal Government may not command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."[72] If FERC eliminates the States' options on local storage resources' participation in the interstate wholesale markets, then FERC is commanding the States to allow these local resources to use distribution facilities for access.[73] FERC's Orders are also likely to mandate changes to some States' regulations to allow local storage resources to participate in wholesale markets.[74]

---

[71]    Order No. 841-A at P 41 (J.A. ___)
[72]    *Murphy v. National Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1476 (2018), citing *Printz v. United States*, 521 U.S. 898, 935 (1997).
[73]    Order No. 841-A at P 48 ("The dissent also characterizes today's order as 'hav[ing] the effect of directing that [electric storage resources] have access to distribution facilities.' That too is incorrect. Although Order No. 841 provides that states may not prohibit electric storage resources from participating in wholesale markets, that requirement does not amount to an effective right of access to the distribution system itself.") (internal footnotes omitted) (J.A. ___).
[74]    For example, the North Carolina Utilities Commission has determined that because it is a traditionally regulated state, retail customers cannot lawfully participate in the relevant federal wholesale market's demand response programs individually or through aggregation by a third party not regulated by the Commission. *Comments of the National Association of Regulatory Utility Commissioners, Participation of Distributed Energy Resource Aggregations in Markets Operated by Regional Transmission Organizations and Independent*

In addition, some States may have to alter or abandon their own local storage resource programs if those resources decide to participate only in the wholesale markets.

FERC attempts to justify its disregard for the potential impact on state programs by pointing out two things. First, that there are not very many state storage resource programs and most are of recent vintage, and second, that when it recognized the state opt-out provision for demand response resources, many state demand response programs were in place.[75] This is a *non sequitur*. It is obvious that the number of existing state programs is irrelevant to Congress' division of authority between the States and FERC.

In addition to hampering state storage programs, such commandeering raises other, more fundamental governance issues. The Supreme Court has determined that adherence to the anticommandeering principle is important for a few reasons. Two of those are particularly relevant here.[76] The first is that:

> the anticommandeering rule promotes political accountability.
> When Congress regulates, the responsibility for the benefits and

---

*System Operators*, FERC Docket No. RM18-9-000, filed on June 26, 2018, at 4 (citing *Order Opting Out of Retail Customer Participating in Wholesale Demand Response Programs* issued March 11, 2010, in NCUC Docket No. E-22, Sub 418. http://starw1.ncuc.net/NCUC/ViewFile.aspx?Id=060b2488-1178-44e9-99bd-e40e07f419e5). The same legal determination could apply to local storage resources as well.

[75] Order No. 841-A at P 52 (J.A. ___).

[76] *Murphy* at 1477.

> burdens of the regulation is apparent.  Voters who like or
> dislike the effects of the regulation know who to credit or
> blame.  By contrast, if a State imposes regulations only because
> it has been commanded to do so by Congress, responsibility is
> blurred.[77]

The same is true when an executive branch agency regulates.  FERC's Orders fail

to recognize the burden of responsibility on the States for any problems that occur

on the distribution system due to the participation of local storage resources in the

federal wholesale markets.  Affected customers or the local resource owners will

undoubtedly call the State entity that regulates the distribution system, and not

FERC, which does not.

If a small business with an appropriately sized storage resource on the

distribution system decides it wants to participate in the federal wholesale market,

there may be operational constraints and/or costs to upgrade the distribution system

to accommodate bidirectional flow of power or costs for new metering technology

necessary to participate in the wholesale market.[78]  The business owner will need

to discuss these matters with the distribution utility, including who should pay for

any system upgrades.  If the parties disagree, then the States will have to resolve

---

[77]    *Murphy* at 1477 (citing *New York* at 168-169 and *Printz v. United States* at 929-930).
[78]    *See e.g.*, Order No. 841-A at P 151 (discussing Xcel Energy Services' comments regarding the need to harden the underlying distribution system to support bidirectional power flows and to install substantial metering upgrades for electric storage resources.)(internal footnotes omitted) (J.A. ___).

these disputes.  Resolving these disputes will place an additional burden on the

state resources, resources that in some States are already spread too thin.

The Supreme Court also pointed out that:

> the anticommandeering principle prevents Congress from shifting the
> costs of regulation to the States.  If Congress enacts a law and requires
> enforcement by the Executive Branch, it must appropriate the funds
> needed to administer the program.  It is pressured to weigh the
> expected benefits of the program against its costs.  But if Congress
> can compel the States to enact and enforce its program, Congress need
> not engage in any such analysis.[79]

Below, several parties raised serious concerns about the costs of implementing

Order No. 841, including the additional metering and accounting necessary to

enable local storage resources to participate in the wholesale markets.[80]  One

pointed out that:

> the implementation costs of the minimum size requirement will
> outweigh any benefits and RTOs/ISOs and distribution utilities may

---

[79]  *Murphy* at 1477.
[80]  *See e.g.*, Order No. 841-A at P 99 ("EEI argues that the number of electric
storage resources that could potentially seek to participate in the wholesale market
at the proposed threshold could become so voluminous that they . . . impose
implementation costs significantly greater than corresponding benefits . . . .") (J.A.
___); at P 151 ("Xcel Energy Services argues that, for distribution utilities, Order
No. 841's implementation costs are disproportionate to the benefits they will
receive, given that the beneficiaries of Order No. 841 are the RTO/ISO markets
and their market participants.  Xcel Energy Services argues that, under [the Federal
Power Act] section 205, the costs that the distribution utilities incur must be
commensurate with the benefits that they receive.  Xcel Energy Services argues
that Order No. 841 will burden distribution utilities and their ratepayers because
they will need to harden the underlying distribution system to support bidirectional
power flows and pay for substantial metering upgrades for electric storage
resources.") (internal footnotes omitted) (J.A. ___).

not be able to manage the volume of smaller resources to participate in RTO/ISO markets and interconnect to the distribution system.[81]

In response, FERC disagreed but failed to acknowledge, let alone address, the valid concerns raised about the impact at the distribution level:

> the 100 kW minimum size requirement is a balance between the benefits of increased competition fostered by the opportunity for smaller resources to participate in the RTO/ISO markets using the electric storage resource participation model and the potential need to update RTO/ISO market clearing software to effectively model and dispatch these smaller resources. Based on the record before us, we find that the benefits of increased competition will outweigh implementation costs, especially given that all RTOs/ISOs are already accommodating the participation of smaller resources in their markets, as demonstrated in the Final Rule.[82]

FERC's focus on the impacts on the wholesale markets and dismissal of concerns regarding costs on the distribution system and to retail customers is emblematic of the Supreme Court's concerns about federal commandeering. And while FERC's markets undoubtedly can provide benefits, the expansion of such markets is not without risks.[83] The States should not be commandeered into supporting FERC's regulatory program and the States' authority to opt out should be preserved.

---

[81] Order No. 841-A at P 103 (J.A. ___).
[82] Order No. 841-A at P 103 (J.A. ___).
[83] *Enron Power Marketing, Inc., et al.*, 103 FERC ¶ 61346, 62348 (June 25, 2003) (finding evidence of gaming and/or anomalous market behavior in violation of federal wholesale market tariffs). Approximately 20 years after the Western market crisis, many States remain outside of centrally dispatched wholesale electricity markets created by FERC.

**CONCLUSION**

The Federal Power Act preserves each State's authority and responsibility to regulate its local distribution system, including whether this system should be used to allow local storage resources to participate in the federal wholesale markets. NARUC respectfully requests that the Court vacate the relevant aspects of the orders and remand the case to FERC.

Date: October 30, 2019

/s/ Jennifer M. Murphy

James Bradford Ramsay
  General Counsel
Jennifer M. Murphy
  Dir. of Energy Policy and Sr. Counsel
National Association of Regulatory Utility
  Commissioners
1101 Vermont Ave, NW, Suite 200
Washington, DC 20005
(202) 898-1350
jmurphy@naruc.org

*Attorneys for Petitioner*
National Association of Regulatory Utility
  Commissioners

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains _____ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using [insert name and version of word processing program] Times New Roman 14-point font.

Date: October 30, 2019

Respectfully submitted,

*/s/ Jennifer M. Murphy*

Jennifer M. Murphy
   Dir. of Energy Policy and Sr. Counsel
National Association of Regulatory Utility
   Commissioners
1101 Vermont Ave, NW, Suite 200
Washington, DC 20005

*Attorney for National Association of*
*Regulatory Utility Commissioners*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: October 30, 2019

Respectfully submitted,

*/s/ Jennifer M. Murphy*

Jennifer M. Murphy
  Dir. of Energy Policy and Sr. Counsel
National Association of Regulatory Utility
  Commissioners
1101 Vermont Ave, NW, Suite 200
Washington, DC 20005

*Attorney for National Association of
Regulatory Utility Commissioners*

# ADDENDUM

TABLE OF CONTENTS
16 U.S.C. § 824(a)
16 U.S.C. § 824(b)
16 U.S.C. § 824(b)(1)
16 U.S.C. § 825*l*
47 U.S.C. §254

18 C.F.R. § 35.28(b)(4).

**16 U.S.C. § 824.**

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**16 U.S.C.A. § 824(b)**
**§ 824(b)(1) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

16 U.S.C.A. § 824e

## § 825*l*. Review of orders

(a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final,

subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

CREDIT(S)

(June 10, 1920, c. 285, § 313, as added Aug. 26, 1935, c. 687, Title II, § 213, 49 Stat. 860; amended June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Aug. 28, 1958, Pub.L. 85-791, § 16, 72 Stat. 947; Aug. 8, 2005, Pub.L. 109-58, Title XII, § 1284(c), 119 Stat. 980.)

16 U.S.C.A. § 825l (West)

## 47 U.S.C. §254. Universal service

**(a) Procedures to review universal service requirements**

**(1) Federal-State Joint Board on universal service** Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

**(2) Commission action** The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

**(b) Universal service principles** The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

**(1) Quality and rates** Quality services should be available at just, reasonable, and affordable rates.

**(2) Access to advanced services** Access to advanced telecommunications and information services should be provided in all regions of the Nation.

**(3) Access in rural and high cost areas** Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

**(4) Equitable and nondiscriminatory contributions** All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

**(5) Specific and predictable support mechanisms** There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

**(6) Access to advanced telecommunications services for schools, health care, and libraries** Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

**(7) Additional principles** Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

**(c) Definition**

**(1) In general** Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

**(2) Alterations and modifications** The Joint oard may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

**(3) Special services** In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

**(d) Telecommunications carrier contribution** Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

**(e) Universal service support** After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

**(f) State authority** A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

**(g) Interexchange and interstate services** Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to

its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

**(h) Telecommunications services for certain providers**

**(1) In general**

*

**(2) Advanced services** The Commission shall establish competitively neutral rules— (A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and (B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

**18 C.F.R. § 35.28**
**(EXCERPT)**

§ 35.28 Non-discriminatory open access transmission tariff.

(b) Definitions—
(1) Requirements service agreement means a contract or rate schedule under which a public utility provides any portion of a customer's bundled wholesale power requirements.

(2) Economy energy coordination agreement means a contract, or service schedule thereunder, that provides for trading of electric energy on an "if, as and when available" basis, but does not require either the seller or the buyer to engage in a particular transaction.

(3) Non-economy energy coordination agreement means any non-requirements service agreement, except an economy energy coordination agreement as defined in paragraph (b)(2) of this section.

(4) Demand response means a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy.