# In the United States Court of Appeals
# for the District of Columbia Circuit

### Nos. 19-1142 and 19-1147 (consolidated)

NATIONAL ASSOCIATION OF REGULATORY
UTILITY COMMISSIONERS, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

JAMES P. DANLY
GENERAL COUNSEL

ROBERT H. SOLOMON
SOLICITOR

ANAND R. VISWANATHAN
JARED B. FISH
ATTORNEYS

FOR RESPONDENT FEDERAL
  ENERGY REGULATORY
  COMMISSION
WASHINGTON, D.C. 20426

JANUARY 31, 2020

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

The Parties before this Court are identified in Petitioners' Circuit Rule 28(a)(1) certificates.

## B. Rulings Under Review

1. *Electric Storage Participation in Markets Operated by Regional Transmission Organizations and Independent System Operators*, Order No. 841, 162 FERC ¶ 61,127 (2018) ("Order 841), R.215, JA___ – ___; and

2. *Electric Storage Participation in Markets Operated by Regional Transmission Organizations and Independent System Operators*, Order No. 841-A, 167 FERC ¶ 61,154 (2019) ("Order 841-A"), R.247, JA___ – ___.

## C. Related Cases

This case has not previously been before this Court or any other court. To counsel's knowledge, there are no related cases pending elsewhere.

/s/ Anand R. Viswanathan
Anand R. Viswanathan

January 31, 2020

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES..............................................................1

COUNTER-STATEMENT OF JURISDICTION.......................................3

STATUTORY AND REGULATORY PROVISIONS ................................4

STATEMENT OF FACTS ....................................................................4

I.      Statutory and regulatory background .........................................4

II.     Background of the Rule on review ..............................................5

        A.      History of competitive wholesale markets .......................5

        B.      The Rule on review...........................................................9

SUMMARY OF ARGUMENT ...............................................................18

ARGUMENT .......................................................................................21

I.      Standard of review....................................................................21

II.     Both sets of Petitioners lack Article III standing, and State
        Petitioners' appeal is also unripe.............................................23

        A.      State Petitioners' alleged injury is conjectural...............23

        B.      State Petitioners' claim is unripe ...................................27

        C.      Utility Petitioners' requested relief will not redress
                their alleged injury..........................................................28

III.    The Commission properly exercised its authority to require
        rules governing electric storage transactions at wholesale......30

        A.      As in *Electric Power Supply Association*, the Rule
                "addresses—and addresses only—transactions
                occurring on the wholesale market" ................................33

B.    The Rule expressly leaves to the States regulation of distribution facilities ........................................................ 36

    1.    The Commission acts lawfully in regulating wholesale transactions occurring over distribution facilities ............................................... 36

    2.    The Rule does not regulate and target distribution facilities ............................................... 41

    3.    The Commission's authority to determine eligibility to transact at wholesale does not regulate and target distribution facilities ............. 45

IV.    A hypothetical state prohibition on distributed storage participation in wholesale markets would target wholesale sales and likely be preempted ..................................................... 53

    A.    State laws targeting wholesale transactions, even to further a legitimate state end, are preempted ................ 54

    B.    A broad prohibition would likely conflict with the important federal policy of promoting competition to ensure just and reasonable wholesale rates ................... 61

V.    The Commission's rule is not arbitrary and capricious ............ 63

CONCLUSION ......................................................................... 70

# TABLE OF AUTHORITIES

**COURT CASES:**                                     **PAGE**

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ............................................... 29–30

*Cal. Indep. Sys. Operator Corp. v. FERC,*
    372 F.3d 395 (D.C. Cir. 2004) .............................................. 31, 33

*Cavel Int'l, Inc. v. Madigan,*
    500 F.3d 551 (7th Cir. 2007) ................................................ 60–61

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ................................................................... 22

*City of Arlington, Tex. v. FCC,*
    569 U.S. 290 (2013) ............................................................. 22, 46

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................. 24–25

*Coal. for Competitive Elec. v. Zibelman,*
    906 F.3d 41 (2d Cir. 2018) .......................................................... 56

*Conn. Dep't of Pub. Util. Control v. FERC,*
    569 F.3d 477 (D.C. Cir. 2009) ............................ 10, 32, 47, 51–52

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ................................................................... 55

*Del. Dep't of Nat. Res. & Envtl. Control v. FERC,*
    558 F.3d 575 (D.C. Cir. 2009) .............................................. 24–25

_____

\* Cases chiefly relied upon are marked with an asterisk.

iii

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*Detroit Edison v. FERC,*
    334 F.3d 48 (D.C. Cir. 2003) ......................................... 37, 39–40

*\*Devia v. NRC,*
    492 F.3d 421 (D.C. Cir. 2007) ............................................ 27–28

*Duke Power Co. v. FPC,*
    401 F.2d 930 (D.C. Cir. 1968) ................................................. 39

*Elec. Power Supply Ass'n v. Star,*
    904 F.3d 518 (7th Cir. 2018) .................................................. 56

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,*
    476 F.3d 326 (5th Cir. 2007) .............................................. 60–61

*Entergy La., Inc. v. La. Pub. Serv. Comm'n,*
    539 U.S. 39 (2003) ...................................................... 57

*Envtl. Action, Inc. v. FERC,*
    939 F.2d 1057 (D.C. Cir. 1991) .......................................... 65–66

*\*FERC v. Elec. Power Supply Ass'n,*
    136 S. Ct. 760 (2016) ........................... 4–5, 15, 21–22, 27, 32–38,
                                                     45, 49–51, 56, 64, 66, 70

*Fla. Gas Transmission Co. v. FERC,*
    604 F.3d 636 (D.C. Cir. 2010) .................................................. 22

*Hughes v. Talen Energy Mktg., LLC,*
    136 S. Ct. 1288 (2016) ............................................. 54–57, 59, 63

*\*Kansas Corp. Comm'n v. FERC,*
    881 F.3d 924 (D.C. Cir. 2018) ............................................ 25–26

iv

# TABLE OF AUTHORITIES

**COURT CASES:**                                           **PAGE**

*La. Energy & Power Auth. v. FERC,*
    141 F.3d 364 (D.C. Cir. 1998) ................................................... 65

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................................... 23, 29

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................. 25

*Midwest ISO Transmission Owners v. FERC,*
    373 F.3d 1361 (D.C. Cir. 2004) .................................................. 5

*\*Miss. Power & Light Co. v. Mississippi ex rel. Moore,*
    487 U.S. 354 (1988) ...................................................... 32, 56–58

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of
Snohomish Cty.,*
    554 U.S. 527 (2008) .................................................................. 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................. 66

*Nantahala Power & Light Co. v. Thornburg,*
    476 U.S. 953 (1986) ........................................................... 57–58

*\*Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC,*
    475 F.3d 1277 (D.C. Cir. 2007) .................... 37, 39–41, 44–45, 52

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior,*
    538 U.S. 803 (2003) ................................................................. 28

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
    366 F.3d 930 (D.C. Cir. 2004) .................................................. 30

# TABLE OF AUTHORITIES

**COURT CASES:**                                              **PAGE**

*New Eng. Power Generators Ass'n, Inc. v. FERC,*
    757 F.3d 283 (D.C. Cir. 2014) ..................................................... 52

*New York v. FERC,*
    535 U.S. 1 (2002) .................................................................. 6, 37

*Northern Natural Gas Co. v. State Corp. Comm'n of Kan.,*
    372 U.S. 84 (1963) ............................................................... 59–60

*Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kan.,*
    489 U.S. 493 (1989) ................................................. 55, 59, 61–62

*Nuclear Energy Inst., Inc. v. EPA,*
    373 F.3d 1251 (D.C. Cir. 2004) ................................................. 66

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015) .......................................... 32, 53–54, 59, 62

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983) ............................................................. 60–61

*PJM Power Providers Grp. v. FERC,*
    880 F.3d 559 (D.C. Cir. 2018) ................................................... 22

*PPL EnergyPlus, LLC v. Nazarian,*
    753 F.3d 467 (4th Cir. 2014) .............................................. 58, 63

*Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC,*
    272 F.3d 607 (D.C. Cir. 2001) ................................................... 24

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988) .................................................................. 57

## TABLE OF AUTHORITIES

**COURT CASES:**                                                 **PAGE**

*S.C. Pub. Serv. Auth. v. FERC,*
    762 F.3d 41 (D.C. Cir. 2014) ..................................................... 22

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .............................................................. 23

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...................................................................... 30

*\*Transmission Access Policy Study Grp. v. FERC,*
    225 F.3d 667 (D.C. Cir. 2000) ........................................ 37, 45, 52

*\*Transmission Agency of N. Cal. v. FERC,*
    495 F.3d 663 (D.C. Cir. 2007) ............................ 26, 39, 47–48, 52

*Va. Uranium, Inc. v. Warren,*
    139 S. Ct. 1894 (2019) .............................................................. 60

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) .................................................................. 25

**ADMINISTRATIVE CASES:**

*Advanced Energy Econ.,*
    161 FERC ¶ 61,245 (2017) ............................................. 46–47, 65

*Cal. Indep. Sys. Operator Corp.,*
    169 FERC ¶ 61,126 (2019) ......................................................... 11

*Elec. Storage Mkts. Operated by Reg'l Transmission Orgs. &*
*Indep. Sys. Operators,* Notice of Proposed Rulemaking,
    157 FERC ¶ 61,121 (2016) ........................................................... 9

**ADMINISTRATIVE CASES:**                                    **PAGE**

*Electric Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841,
    162 FERC ¶ 61,127 (2018) ....................................... 6–11, 14–16,
                    24, 34–35, 41–42, 49, 62, 64–65, 67–69

*Electric Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841-A,
    167 FERC ¶ 61,154 (2019) ................................... 2, 9–18, 24–25,
                    31–35, 37–38, 41–52, 53–54, 57–58,
                    61–62, 64–69

*ISO New England Inc.*,
    169 FERC ¶ 61,140 (2019) ......................................... 11

*Midcontinent Indep. Sys. Operator, Inc.*,
    169 FERC ¶ 61,137 (2019) ......................................... 11

*N.Y. Indep. Sys. Operator, Inc.*,
    169 FERC ¶ 61,225 (2019) ......................................... 11

*PJM Interconnection, L.L.C.*,
    169 FERC ¶ 61,049 (2019) ......................................... 12

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003-C,
    111 FERC ¶ 61,401 (2005) ................................... 40, 44

*Sw. Power Pool, Inc.*,
    169 FERC ¶ 61,048 (2019) ......................................... 11

# TABLE OF AUTHORITIES

**STATUTES:**                                            **PAGE**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ...................................................... 21

Federal Power Act

    Section 201, 16 U.S.C. § 824 ...................................... 33

    Section 201(b), 16 U.S.C. § 824(b) ....................... 14, 38

    Section 201(b)(1), 16 U.S.C. § 824(b)(1)............ 36–37, 39, 41, 52, 55–56

    Section 201(e), 16 U.S.C. § 824(e).............................. 48

    Section 201(f), 16 U.S.C. § 824(f) .............................. 40

    Section 203(a), 16 U.S.C. § 824b(a) .......................... 39

    Section 205, 16 U.S.C. § 824d ................................. 4, 6

    Section 205(a), 16 U.S.C. § 824d(a) ................... 8, 14–15, 33, 37, 64–65

    Section 206, 16 U.S.C. § 824e ................................. 5–6

    Section 206(a), 16 U.S.C. § 824e(a)...................... 5, 8, 14–15, 33, 37, 48, 50, 64–65

Natural Gas Act

    Section 1(b), 15 U.S.C. § 717(b) ................................ 59

# TABLE OF AUTHORITIES

**REGULATIONS:**                                     **PAGE**

18 C.F.R. § 35.28(b)(9).................................................................. 7

18 C.F.R. § 35.28(g)(9)(i) ............................................................ 10

18 C.F.R. § 35.28(g)(9)(ii) ........................................................... 10

18 C.F.R. § 35.28(g)(9)(i)(A) ....................................................... 10

**MISCELLANEOUS:**

*U.S. Battery Storage Market Trends,*
U.S. Energy Info. Admin. (May 2018) ......................................... 8

# GLOSSARY

| | |
|---|---|
| Commission or FERC | Federal Energy Regulatory Commission |
| Distributed storage or distributed storage resources | Electric storage resources that use distribution facilities to transact at wholesale |
| Order 841 | *Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841, 162 FERC ¶ 61,127 (2018), R.215, JA___. |
| Order 841-A | *Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841-A, 167 FERC ¶ 61,154 (2019), R.247, JA___. |
| R. | Item in the certified index to the record |
| Rule | Order Nos. 841 and 841-A, collectively |
| State Br. | Brief of Petitioner National Association of Regulatory Utility Commissioners |
| State Petitioners | Petitioner National Association of Regulatory Utility Commissioners |
| Utility Br. | Brief of Petitioners American Public Power Association, National Rural Electric Cooperative Association, Edison Electric Institute, and American Municipal Power, Inc. |
| Utility Petitioners or Utilities | Petitioners American Public Power Association, National Rural Electric Cooperative Association, Edison Electric Institute, and American Municipal Power, Inc. |

# In the United States Court of Appeals for the District of Columbia Circuit

## Nos. 19-1142 and 19-1147 (consolidated)

─────────────────

NATIONAL ASSOCIATION OF REGULATORY
UTILITY COMMISSIONERS, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

─────────────────

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

─────────────────

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

─────────────────

## STATEMENT OF THE ISSUES

This case concerns a rulemaking by the Federal Energy
Regulatory Commission ("Commission" or "FERC") that removes
barriers to the participation of electric storage resources in the
wholesale electricity markets regulated by the Commission.

An electric storage resource is a resource capable of receiving
electric energy from the grid and storing it for later injection of energy

back to the grid. These resources are located on the interstate transmission system, on local distribution systems, and "behind the meter" (i.e., where electricity is used at the retail level).

In the orders on review—Order Nos. 841 and 841-A (collectively, the "Rule")—the Commission found that existing wholesale market rules created unwarranted barriers to participation by electric storage resources in the wholesale market, resulting in lower available supply of electricity, reduced competition, and higher wholesale prices. To ensure "just and reasonable" wholesale rates, as the FERC-administered Federal Power Act requires, the Rule obligates wholesale market operators to allow all eligible electric storage resources to make wholesale sales of energy, regardless of whether the resources are located on the transmission grid, the distribution grid, or behind a retail customer's meter.

In crafting the Rule, the Commission denied requests to disclaim its jurisdiction over wholesale transactions by electric storage resources that use distribution facilities to engage in those transactions.

**The questions presented are:**

1. Did the Commission, in exercising its unquestioned statutory authority over wholesale electricity transactions, impermissibly infringe on state authority over distribution facilities by refusing to disclaim jurisdiction over wholesale sales by electric storage resources that *use* those facilities?

2. Even if the Commission acted within its statutory authority, was it arbitrary and capricious for the Commission *not* to disclaim jurisdiction over wholesale sales by distribution system-connected electric storage resources?

## COUNTER-STATEMENT OF JURISDICTION

As explained in Argument section II, both petitions should be dismissed for lack of Article III standing. Petitioner National Association of Regulatory Utility Commissioners ("State Petitioners") fails to establish that the Rule results in actual or imminent, concrete harm to its claimed interests; and Utility Petitioners[1] fail to show that

---

[1]     This brief refers to Petitioners American Public Power Association, National Rural Electric Cooperative Association, Edison Electric Institute, and American Municipal Power, Inc., as "Utility Petitioners" or "Utilities."

the relief sought from this Court will remedy their claimed injury. State Petitioners' appeal may also be dismissed on ripeness grounds because it is uncertain that some hypothetical, yet-to-exist state law will conflict with the Rule and because these Petitioners will suffer no legally cognizable hardship if review is withheld at this time.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the Addendum to this brief.

## STATEMENT OF FACTS

## I.  Statutory and regulatory background

Section 201 of the Federal Power Act, 16 U.S.C. § 824, gives the Commission exclusive jurisdiction over the rates, terms, and conditions of service for the transmission and sale at wholesale of electric energy in interstate commerce. *See, e.g.*, *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 766–68 (2016) (describing federal regulation and development of energy markets).

Under section 205 of the Federal Power Act, 16 U.S.C. § 824d, "[a]ll rates and charges … by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of

the Commission," "and all rules and regulations affecting or pertaining to such rates or charges," must be "just and reasonable" and not "undu[ly] preferen[tial]."

Section 206 of the Federal Power Act, 16 U.S.C. § 824e, authorizes the Commission, on its own initiative or on a third-party complaint, to investigate whether existing rates are lawful. If the Commission finds that an existing rate is "unjust, unreasonable, unduly discriminatory, or preferential," it must determine and set the new just and reasonable rate. *Id.* § 824e(a).

## II.   Background of the Rule on review

### A.   History of competitive wholesale markets

"In the bad old days," the energy industry was dominated by vertically-integrated monopolies. *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004) (Roberts, J.). At the time of the Federal Power Act's enactment in 1935, and continuing for several decades thereafter, "state or local utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas." *Elec. Power Supply Ass'n*, 136 S. Ct. at 768. That began to change in the latter part

of the 20th century, as the number of electricity suppliers (i.e., owners of generation facilities) increased "dramatically." *New York v. FERC*, 535 U.S. 1, 7 (2002). At the same time, regional wholesale electric grids began displacing smaller, local grids, thereby facilitating the transmission of electricity over long distances at low cost. *Id.* at 7–8; *see also Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 535–37 (2008).

Seeking to promote the benefits of competition in this changing landscape, the Commission issued its seminal Order Nos. 888 and 2000 rulemakings in 1996 and 1999. *New York*, 535 U.S. at 11–12; *Midwest ISO*, 373 F.3d at 1364. Those orders, respectively, required utilities to provide non-discriminatory access to their transmission lines and encouraged development of regional wholesale markets—operated by, in industry parlance, regional transmission organizations and independent system operators (hereafter, "wholesale market operators")—all to promote competition and ensure "just and reasonable" wholesale rates. *New York*, 535 U.S. at 11–12; *Midwest ISO*, 373 F.3d at 1364; 16 U.S.C. §§ 824d, 824e.

The Rule on review builds on those initiatives by harnessing advancements in electric storage technology in regional wholesale markets. *See Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841, 162 FERC ¶ 61,127, at P 7 (2018) ("Order 841"), R.215, JA___. Electric storage resources are, as their name implies, resources "capable of receiving electric energy from the grid and storing it for later injection of electric energy back to the grid." *Id*. PP 1 n.1, 7, JA___, ___; 18 C.F.R. § 35.28(b)(9); *see also, e.g.*, Connecticut Comments, FERC Dkt. Nos. RM16-23-000, *et al.*, at 3 (Feb. 10, 2017) (noting that storage technologies can "capture the excess power renewable resources (and other generators) produce at certain times and then release it when the power is needed"), R.102, JA___.

Such resources include all manner of electric storage technologies, e.g., batteries, flywheels, compressed air, and pumped-hydro facilities.[2]

---

[2]  For example, pumped-hydro facilities move water between two reservoirs located at different elevations to store energy and generate electricity.  Order 841 at P 7 n.12, JA___.  For further discussion of the various types of storage technologies, *see* https://energystorage.org/why-energy-storage/technologies/.

Order 841 at PP 22, 29, JA___, ___.  Battery storage, in particular, has experienced dramatic growth over recent years:  At the end of 2017, the United States had 708 megawatts of "large-scale" battery storage in place, two-thirds of which were installed in the previous three years.[3]

Certain electric storage resources have participated in the wholesale markets for years.  Order 841 at P 7, JA___.  But the Commission found that current market rules—which it must review for justness and reasonableness, 16 U.S.C. §§ 824d(a), 824e(a)—were geared toward traditional generation resources (e.g., power plants), and were not designed to facilitate the competitive and cost-saving benefits of electric storage technology.  Order 841 at P 2, JA___.

Those existing rules, in the Commission's expert judgment, created unwarranted barriers to the participation of many electric storage resources that were technically capable of providing energy to

---

[3]     U.S. Energy Info. Admin., *U.S. Battery Storage Market Trends*, at 4, 6 (May 2018), https://www.eia.gov/analysis/studies/electricity/batterystorage/pdf/battery_storage.pdf.  The report defines "large-scale" as including those systems that are grid-connected and have a power capacity greater than one megawatt.  *Id*. at 1 n.3.

the wholesale markets and prevented them from competing with traditional resources. *Id*. PP 2, 19–20, JA___–__; *see also id*. P 2 (citing *Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Notice of Proposed Rulemaking, 157 FERC ¶ 61,121, at P 2 (2016), R.65, JA___), JA___. These market barriers also reduced competition and market efficiency "by inhibiting developers' incentives to design their electric storage resources to provide all capacity, energy, and ancillary services that these resources could otherwise provide." *Id*. P 20, JA___; *see also id*. P 12, JA___. The upshot was that more expensive resources than necessary might be dispatched to meet system needs. *Id*. P 2, JA___; *see also Elec. Storage Participation in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 841-A, 167 FERC ¶ 61,154, at P 70 (2019) ("Order 841-A"), R.247, JA___.

The Commission's nearly 15-month review culminated in the Rule on review here.

### B.    The Rule on review

The Rule removes barriers to electric storage participation in wholesale markets.  It requires wholesale market operators to establish

market rules that, "recognizing the physical and operational characteristics of electric storage resources, facilitate[] their participation in the [wholesale] markets." Order 841-A at P 2, JA___; *see also* 18 C.F.R. § 35.28(g)(9)(i). Market operators must allow qualifying resources to "provide all capacity, energy, and ancillary services that [they are] technically capable of providing."[4] Order 841-A at PP 2, 86 & n.190, JA___, ___; 18 C.F.R. § 35.28(g)(9)(i)(A). And market rules must cover both sales of energy *by* an electric storage resource to the electric grid, as well as sales of energy *to* a storage resource that the resource then resells into a wholesale market. *See, e.g.*, Order 841 at PP 4, 30, 295, 300, JA___, ___, ___, ___; Order 841-A at P 49, JA___; 18 C.F.R. § 35.28(g)(9)(i)–(ii).

The Rule defines "eligible storage resource" to cover all such resources that inject electric energy back to the grid for the purpose of participating in a FERC-jurisdictional wholesale market. Order 841-A at PP 5–6, JA___–__; Order 841 at PP 29–30, JA___–__. It matters not

---

[4] "Capacity is not electricity itself but the ability to produce it when necessary." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009) (internal quotation marks omitted).

the resource's physical location—i.e., on the interstate transmission system, on a local distribution system, or "behind the meter" (the latter two groups of resources are hereafter termed "distributed storage resources").[5] Order 841-A at P 5, JA___–__; Order 841 at P 29, JA___.

The Rule requires each wholesale market operator to file tariff changes within 270 days of Order 841's publication in the Federal Register, with a further 365 days from that date to implement the new tariff provisions. Order 841 at P 6, JA___; Order 841-A at P 154, JA___. All FERC-jurisdictional wholesale market operators have made the requisite filings, and the Commission issued orders in late 2019 on the new market rules. *See N.Y. Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,225 (2019); *ISO New England Inc.*, 169 FERC ¶ 61,140 (2019); *Cal. Indep. Sys. Operator Corp.*, 169 FERC ¶ 61,126 (2019); *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,137 (2019); *Sw. Power Pool,*

---

[5] "Behind the meter" refers to a resource located where electricity is used at the retail level. *See* Order 841-A at P 13, JA___; Order 841 at P 26, JA___.

*Inc.*, 169 FERC ¶ 61,048 (2019); *PJM Interconnection, L.L.C.*, 169
FERC ¶ 61,049 (2019).

The only States that mention existing retail-level storage
programs in their comments on the Commission's storage initiative—
California, Connecticut, Massachusetts, and New York—all support the
Commission's action to remove barriers to electric storage resources,
including distributed storage resources, joining the wholesale markets.
*See* Order 841-A at P 52 n.145, JA___; California Comments, FERC
Dkt. Nos. RM16-23-000, *et al.*, at 3 (Feb. 13, 2017) (noting potential for
electric storage resources to be "grid assets and alternatives to
conventional generation"), R.173, JA___; Connecticut Comments at 1
(expressing "strong[] support[]"), JA___; Massachusetts Comments,
FERC Dkt. No. RM16-23-000, at 2–3, 6, 8–9 (Feb. 13, 2017), R.156,
JA___–___, ___, ___–___; New York Comments, FERC Dkt. Nos. RM16-
23-000, *et al.*, at 3 (Feb. 13, 2017), R.134, JA___; *see also* Ohio
Comments, FERC Dkt. Nos. RM16-23-000, *et al.*, at 2–3 (Feb. 13, 2017),
R.111, JA___–__.

Other parties, including Petitioners here, complained that the
Commission should have allowed States to bar distributed storage

resources from participating in the wholesale markets. *See* Order 841-A at PP 11–13, 39, JA___–__, ___. State Petitioners and most Utility Petitioners argued that States, as regulators of local distribution systems, have final authority over those resources' wholesale transactions, and so States *must* be permitted to "opt out" of the federal program. *Id.* PP 12–13, 15, JA___–___, ___.

One of the Utility Petitioners, Edison Electric Institute, acknowledged that the Commission "has exclusive jurisdiction over the market rules for participation in the wholesale markets of distribution connected resources," but argued that the Commission *should*, as a matter of policy, allow States to opt out of the federal program. Edison Electric Institute Request for Reh'g, FERC Dkt. Nos. RM16-23-000, *et al.*, at 4–5, 8 (Mar. 19, 2018), R.226, JA___–__, ___. The challengers also argued that declining to grant a State opt-out is bad policy because distribution systems would be stressed by distributed storage wholesale sales. *See, e.g.*, Order 841-A at P 23, JA___; *id.*, Comm'r McNamee Dissent at PP 17–18, JA___–___.

Dissenting in part from the Rule, one Commissioner similarly argued that a refusal to grant a State opt-out effectively "mandates"

that distributed storage resources "be permitted to use distribution facilities so that they may access the wholesale market." *Id*., Dissent at PP 5 & n.18, 11, JA___, ___.

The Commission rejected a State opt-out on legal and policy grounds. First, it explained that, regardless of *where* a storage resource is located on the electric grid, that resource "engages in a sale of electric energy at wholesale in interstate commerce" if it injects energy back into the grid for the purpose of making a wholesale transaction. *Id*. PP 5–6, JA___–__; Order 841 at PP 29–30, JA___–__. Thus, the resource's wholesale transactions fall within FERC's Federal Power Act jurisdiction to regulate wholesale sales of energy. Order 841-A at P 6, JA___; Order 841 at P 30, JA___; *see also* 16 U.S.C. §§ 824(b), 824d(a), 824e(a).

The Commission also explained that its exclusive jurisdiction over practices directly affecting wholesale rates extends to "the criteria for participation in [wholesale] markets, including the wholesale market rules for participation of resources connected at or below distribution-level voltages." Order 841-A at PP 9, 37–38, JA___, ___–__. And, as a practical matter, it noted that "numerous resources connected to the

distribution system [already] participate in the [wholesale] markets today." *Id*. P 9, JA___; *see also* Order 841 at P 35, JA___.

Second, the Commission explained that permitting *all* eligible storage resources to participate in the wholesale markets is sound policy. It found that doing so would promote "greater participation of electric storage resources in [wholesale] markets," thereby increasing competition and lowering wholesale rates. Order 841-A at PP 45, 56, JA___, ___; Order 841 at PP 2, 20, ___, ___; *see also Elec. Power Supply Ass'n*, 136 S. Ct. at 778 (explaining that lower wholesale rates "bring down retail rates"). And it found that the converse is also true: allowing States to bar distributed storage participation would prevent FERC from fulfilling its statutory duty of ensuring "just and reasonable rates." *See* Order 841-A at PP 37–38, 41, 47, JA___–__, ___, ___; 16 U.S.C. §§ 824d(a), 824e(a).

The Commission also clarified that the Rule requires no affirmative action by States to facilitate distributed storage transactions at wholesale. Order 841-A at P 48, JA___. The Rule explicitly "*does not modify*" States' existing authority to regulate the

distribution system, including the "terms of access" to distribution facilities. *Id*. (emphasis added); *see also id*. P 44, JA___.

Thus, to the extent States had authority before the Rule to set the terms and conditions of access to the distribution system, they retain that authority after the Rule. *Id*. P 48 (explaining that the Rule does not "amount to an effective right of access [by distributed storage resources] to the distribution system itself"), JA___. So before a distributed resource may participate at wholesale, it first must be contractually permitted to do so—meaning it must have the requisite permits, agreements, and other necessary documentation to ensure its ability to inject energy back to the grid. *Id*. PP 42, 46, JA___, ___.

The Commission also explicitly left to States technical and operational authority over distribution facilities. *Id*. P 42, JA___. The Rule precludes the Commission from second-guessing state decisions over the "'design, operations, power quality, reliability, and system costs'" of distribution systems. *See id*. (quoting Order 841 at P 36, JA___); *see also id*. P 46 ("[N]othing in Order No. 841 preempts the states' right to regulate the safety and reliability of the distribution system ...."), JA___. And it leaves States free to determine any

necessary technical requirements and system upgrades to "safeguard against reliability or safety concerns." *Id.* P 42, JA___.

Further, the Commission explained that, under the Rule, States are free to require would-be participants in state *retail* electric storage programs to choose between participating in the retail market or in the wholesale market. *Id.* P 41, JA___. States may also proscribe, in the terms and conditions of retail service, resales in wholesale markets of energy originally purchased at retail. *See id.* P 46 n.125, JA___.

Finally, the Commission noted that the Rule avoids placing new obligations—technical or otherwise—on utilities that operate distribution facilities. *Id.* P 45, JA___. To the extent distribution utilities incur costs associated with enabling the participation of electric storage resources in wholesale markets, the Rule does not alter those utilities' ability "to allocate any costs that they incur in operating and maintaining their respective power systems." *Id.*

The Rule's only constraint on state authority—and the focus of this dispute—is that States may not enact "broad prohibition[s] on [distributed energy resources] participating in the [wholesale] markets." *Id.* P 42, JA___. Such sweeping bans, the Commission explained, would

aim directly at the Commission's jurisdiction over wholesale sales, and moreover would not be reasonably related to States' existing authority over interconnections to the distribution system by certain resources. *Id.* PP 41–42, JA___–___. Accordingly, these prohibitions, which "intrude on the Commission's jurisdiction" over wholesale markets, would be preempted under established federal law. *See id.* PP 41 & n.112, 47, JA___, ____.

Both sets of Petitioners here seek a limited vacatur of the Rule to the extent it prevents States from "broadly prohibiting" the participation of distributed storage resources in the wholesale markets. Utility Br. 38; *see also* State Br. 37.

## SUMMARY OF ARGUMENT

The Rule on review does not take away *any* power that States had before the Rule. By leaving untouched state authority over the technical and operational facets of distribution facilities, it does not infringe on the interests to which State Petitioners allege harm: state power to regulate the safety and reliability of distribution systems. State Petitioners' injury is, at most, conjectural and abstract, rather than imminent and concrete, meaning they lack Article III standing.

Their appeal is also unripe due to lingering uncertainty over whether some hypothetical, yet-to-exist state action will conflict with the Rule. Utility Petitioners lack standing, too. What they seek from this Court will not remedy their claimed harm—the Rule's effects on distribution facilities they operate.

On the merits, the Rule is a valid exercise of the Commission's authority under the Federal Power Act. The Rule is directed at FERC-jurisdictional wholesale market operators. It addresses only wholesale transactions occurring in the wholesale markets. And it is designed to improve the functioning of those markets, spur greater competition, and reduce wholesale rates—all aims that fall comfortably within the Commission's jurisdictional responsibilities.

State and Utility Petitioners do not dispute that the Rule lawfully regulates a practice directly affecting wholesale rates: all wholesale transactions by storage resources, regardless of such resources' physical location. Yet even as they concede that the Rule represents a valid exercise of federal authority, in Petitioners' view that authority hinges on giving States a veto. But the Federal Power Act does not obligate

the Commission to disclaim its authority, out of deference to the States, over matters within its jurisdiction.

This Court, moreover, has repeatedly confirmed that the Federal Power Act vests the Commission with exclusive jurisdiction over wholesale sales of energy, regardless of the facilities used to make those transactions. That jurisdiction necessarily extends to determining which entities may engage in wholesale sales.

Further, the Rule here does not intrude upon matters the Federal Power Act reserves to the States. It does not "commandeer" States by dictating their regulation of state-jurisdictional distribution facilities or the distribution system itself. Nor does it require utilities at the distribution level to participate in the wholesale market. The Rule applies only to resources that, among other things, are physically able to inject energy onto the grid. States retain their existing, plenary authority over the operations, design, reliability, and costs of distribution systems.

Petitioners ask this Court to overturn the Rule so States may (in the future) categorically prohibit all wholesale transactions by distributed storage resources. But this sort of sweeping state law, if

enacted, plainly targets FERC's authority over the wholesale energy markets and would be preempted by the Federal Power Act. And, in any event, a future dispute over whether a specific state law is preempted can be resolved in an appropriate future case.

Finally, the Commission reasonably explained its decision not to permit the veto Petitioners seek. In particular, the Commission found that allowing all eligible electric storage resources to participate in the wholesale markets would enhance competition and ensure just and reasonable wholesale rates. And it gave a reasonable justification for distinguishing the one instance in which it previously granted a State opt-out. Accordingly, the Rule should be upheld under the arbitrary and capricious standard.

## ARGUMENT

## I. Standard of review

This Court reviews Commission orders under the Administrative Procedure Act's deferential "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A); *Elec. Power Supply Ass'n*, 136 S. Ct. at 782. Review under this standard is narrow. *Elec. Power Supply Ass'n*, 136 S. Ct. at 782. "A court is not to ask whether a regulatory decision is the

best one possible or even whether it is better than the alternatives." *Id.*

"Rather, the court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Id.* (cleaned up).

"[N]owhere is that more true than in a technical area like electricity rate design." *Id.* "In rate-related matters, the Court's review of the Commission's determinations is particularly deferential because such matters are either fairly technical or involve policy judgments that lie at the core of the regulatory mission." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54–55 (D.C. Cir. 2014) (cleaned up); *see also PJM Power Providers Grp. v. FERC*, 880 F.3d 559, 562 (D.C. Cir. 2018).

Further, the Commission's interpretation of the Federal Power Act, including its own jurisdiction under that statute, is entitled to *Chevron* deference. *See, e.g.*, *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 301–04 (2013) (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *South Carolina*, 762 F.3d at 54. And its factual determinations "are conclusive if supported by substantial evidence." *South Carolina*, 762 F.3d at 54; *see also, e.g.*, *Fla. Gas*

*Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) ("[W]e do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the Commission's ultimate decision.").

## II. Both sets of Petitioners lack Article III standing, and State Petitioners' appeal is also unripe

The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

### A. State Petitioners' alleged injury is conjectural

State Petitioners frame their injury as the Rule's "adverse[] [e]ffect" on States' power to regulate distribution systems in a way that ensures "safe, reliable, and affordable delivery of electric service to

consumers." State Br. 13. But because the Rule leaves to the States their existing authority to regulate distribution systems to protect those very interests, any harm to those interests is conjectural. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *cf. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607, 617 (D.C. Cir. 2001) (deeming injury speculative where it was uncertain that a Commission rulemaking—Order No. 2000, promoting the development of regional wholesale markets—would affect petitioner utilities).

Indeed, the Rule confirms continued state authority over the "'design, operations, power quality, reliability, and system costs'" of distribution systems. Order 841-A at P 42 (quoting Order 841 at P 36, JA___), JA___. This includes state regulation of "technical requirements" and system upgrades that States may deem necessary to "safeguard against reliability or safety concerns." *Id.*; *see also id.* P 48 (explaining that the Rule does not "amount to an effective right of access [by distributed storage resources] to the distribution system itself"), JA___; *Del. Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 578 (D.C. Cir. 2009) (finding no injury from Commission order because it preserved the State's statutory authority). And the Rule's

sole constraint on state authority is narrowly tailored to preclude only a "broad prohibition" by States on distributed storage participation in wholesale markets. Order 841-A at PP 41–42, 48, JA___–___, ___. Accordingly, far from showing the requisite "'threatened injury'" that is "'certainly impending,'"[6] State Petitioners at most allege "'possible future injury.'" *Clapper*, 568 U.S. at 409 (emphasis omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

This Court recently rejected a similarly gossamer allegation of injury in *Kansas Corporation Commission v. FERC*. There, a state commission challenged preapproved formula rates that would not be immediately implemented. 881 F.3d 924, 930 (D.C. Cir. 2018). Because Kansas did not know if the formula rates would, in fact, "turn out to be unjust or unreasonable" until they took effect, the Court held that any

---

[6] To the extent State Petitioners argue (belatedly) on reply that their member state agencies are entitled to "special solicitude" in the standing analysis, that is of no consequence because they still must demonstrate a concrete and particularized, actual or imminent injury-in-fact. *See, e.g.*, *Delaware*, 558 F.3d at 579 n.6 ("special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury") (emphasis in original); *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018) (dismissing state commission appeal under the *Lujan* three-part standing test); *cf. Massachusetts v. EPA*, 549 U.S. 497, 518–23 (2007).

injury was speculative—i.e., it was possible Kansas would have "no reason" to challenge the formula rates and thus "there would be no harm." *Id.* at 930–31; *see also Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 670 (D.C. Cir. 2007) (government entities lacked presently concrete injury from Commission order on wholesale rates because none of those entities had actually "sought to participate" in the wholesale market).

State Petitioners' claim of standing here is even weaker.  It is speculative that a State will take *any* action to address any safety and reliability concerns that the Rule might pose.  *See Transmission Agency of N. Cal.*, 495 F.3d at 670.  And because the Rule expressly preserves States' authority to do just that, it is doubly speculative that a (hypothetical) action to that end would run counter to the Rule's bar on broad state prohibitions of distributed storage transactions at wholesale.[7]  *Kansas Corp. Comm'n*, 881 F.3d at 930–31.  State

---

[7]    In fact, the only State to independently submit comments that included a request for a State opt-out (Missouri) noted that its position "does not mean [Missouri] has the intention" of exercising an opt-out—rendering even more speculative State Petitioners' averred injury. Missouri Comments, FERC Dkt. Nos. RM16-23-000, *et al.*, at 2–3 (Mar. 29, 2019), R.243, JA___.

Petitioners invite precisely the sort of guesswork that this Court (rightfully) declines under well-established precedent, and it warrants dismissal here.[8]

## B.   State Petitioners' claim is unripe

The speculative nature of State Petitioners' injury implicates another check on this Court's review:  ripeness.  Whether a dispute is ripe turns on (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."  *Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007) (internal quotation marks omitted).  Animating this inquiry is a concern against judicial prejudgment of a dispute that may never arise.  *Id*.

State Petitioners' appeal fails both ripeness prongs.  That the Rule does not abridge States' authority to regulate the safety and reliability of distribution systems, *see supra* at 15–17, renders their petition, at

---

[8]   In contrast, in *Electric Power Supply Association*—which concerned participation of retail-side demand response resources in the wholesale markets—standing was not contested because the rule there also established a new approach to wholesale compensation for participating demand response resources.  *See* 136 S. Ct. at 782–83. Here, the Rule does not establish a new approach to wholesale compensation for distributed storage resources, nor do Petitioners claim injury from the price that those (or other) resources will receive under the Rule.

most, premature. *Id.* Any collision between the Commission's narrow statement of what States cannot do and *concrete*, *future* state enactments "may not occur as anticipated, or indeed may not occur at all." *Id.* at 425 (internal quotation marks omitted). Thus, as to the fitness prong, "further factual development," i.e., actual state action, "would significantly advance [the Court's] ability to deal with the legal issues presented." *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (internal quotation marks omitted).

On the hardship prong, absent such state action, State Petitioners' harm amounts only to uncertainty over the Rule's legality. *See Devia*, 492 F.3d at 427. That is not enough: "'[M]ere uncertainty as to the validity of [an agency's] legal ruling'" generally does not amount to the requisite "hardship." *Id.* (quoting *Nat'l Park*, 538 U.S. at 811). At bottom, State Petitioners seek an "'advisory opinion'" on a dispute that may never come to pass—a paradigmatic example of a petition unfit for judicial review. *Id.* (quoting *Nat'l Park*, 538 U.S. at 811).

## C. Utility Petitioners' requested relief will not redress their alleged injury

Utility Petitioners' averred injury stems from the operation of the Rule itself—i.e., "operational, reliability, and safety" impacts on

distribution systems "that they will have to address to implement the [Rule]." *See* Utility Br. 13. Their standing, however, founders on the redressability prong of the analysis.

Utility Petitioners seek a determination that States may "broadly prohibit[] distributed electric storage resources from participating in wholesale markets." Utility Br. 38; *see also* State Br. 13, 37. They do *not* seek a determination that the Rule unlawfully establishes rules governing distributed storage wholesale transactions in the first place. Thus, granting Petitioners' desired relief will not relieve stress on distribution facilities (Utilities' averred harm) allegedly caused by the Rule because the Rule will still take effect. Remedying their claimed injury—assuming they have even alleged an imminent, concrete injury-in-fact—depends on *States* taking independent action to block those resources from participating under the Rule.

Although "standing is not precluded" in a case that turns on third-party conduct, "it is ordinarily substantially more difficult to establish." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (quoting *Lujan,* 504 U.S. at 562). A petitioner must show "'substantial evidence of a causal relationship between the [Commission's] policy and the third-party

conduct, leaving little doubt as to causation and the likelihood of redress.'" *Id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004)).

Petitioners fail to satisfy this test because they proffer no evidence of imminent state action. Accordingly, Utility Petitioners lack standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

## III. The Commission properly exercised its authority to require rules governing electric storage transactions at wholesale

Petitioners explicitly accept the Commission's authority over the "terms under which electric storage resources sell into the wholesale markets"—what Utility Petitioners deem the "'how' of participation." Utility Br. 16; *see also* State Br. 25 ("To be clear, *[Electric Power Supply Association] does* support FERC's authority to determine *how* resources participate in the wholesale markets *once they are part of that market* ....") (last emphasis added); *accord* State Br. 15-16. They seek only a determination that States may *veto* the Commission's authority (i.e., to

regulate *whether* a distributed storage resource may transact at wholesale at all).

Petitioners' acknowledgment of the Commission's power to regulate distributed storage resources' wholesale sales means States cannot also claim the right to regulate (here, through a veto) those same transactions. After all, the Commission's power comes from Congress— not the States. *See, e.g.*, *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) ("As a federal agency, FERC is a creature of statute, having no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress.") (cleaned up).

Absent a clear statement from Congress, any grant of authority from Congress to the Commission is not conditioned on, or subject to, state approval. *See* Order 841-A at P 38 ("The Commission has exclusive jurisdiction over the wholesale markets and the criteria for participation in those markets, including the wholesale market rules for participation of resources connected at distribution-level voltages or behind the meter."), JA___. Thus, if the Commission may regulate distributed storage transactions in wholesale markets (as all parties

agree), then that power works to the exclusion of the States. *See Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 374 (1988) ("States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates ….").

Petitioners' concession "radically simplifies" the Court's inquiry. *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009). As explained below, the Commission's jurisdiction extends to those activities Petitioners acknowledge the Rule regulates: wholesale sales and practices directly affecting wholesale rates. Thus, the Commission acts lawfully to those ends *unless* its actions target and directly regulate areas the Federal Power Act expressly reserves to the States—e.g., distribution facilities. *Elec. Power Supply Ass'n*, 136 S. Ct. at 774–79; *see also Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). Because the Rule does not target and regulate *any* aspect of electric distribution systems, but instead regulates only wholesale sales by entities that *use* those systems, the Rule is a lawful exercise of Commission authority. *See, e.g.*, Order 841-A at PP 38–39, 44, 48–49, JA___–__, ___, ___–__.

**A.** As in *Electric Power Supply Association*, the Rule "addresses—and addresses only—transactions occurring on the wholesale market"

The Federal Power Act "obligates FERC to oversee all prices" for interstate transactions in the transmission and wholesale sale of electric energy, and "all rules and practices affecting such prices." *Elec. Power Supply Ass'n*, 136 S. Ct. at 767; *see also* Order 841-A at P 32, JA___; 16 U.S.C. §§ 824, 824d(a), 824e(a). The Commission's "affecting" jurisdiction is limited to "rules or practices that '*directly* affect the [wholesale] rate.'" *Elec. Power Supply Ass'n*, 136 S. Ct. at 774 (quoting *Cal. Indep. Sys. Operator*, 372 F.3d at 403) (emphasis in *Elec. Power Supply Ass'n*).

Petitioners concede that the Rule regulates a practice—wholesale transactions by electric storage resources—that directly affects wholesale rates. Utility Br. 16; State Br. 15–16, 25. That concession flows directly from the Supreme Court's holding in *Electric Power Supply Association*. There, the Court upheld a federal program regulating demand response bids by *retail* customers in the wholesale markets. 136 S. Ct. at 769–70, 774–79. A demand response bid in the wholesale market reflects a commitment to curtail energy consumption,

thereby decreasing demand and pushing down wholesale prices. *Id*. at 769–70. Because the program directly affected wholesale rates, and regulated only wholesale market transactions, the Court held that it fell well within FERC's statutory authority. *Id*. at 774–76.

Same here. The Rule is directed at, and imposes obligations only on, FERC-jurisdictional wholesale market operators. *See, e.g.*, Order 841 at PP 1, 3–4, 6, JA___, ___–__, ___. Those market operators "administer the entire program," *Elec. Power Supply Ass'n*, 136 S. Ct. at 776, by establishing their own set of market rules (or "participation models") governing wholesale sales by electric storage resources. *See* Order 841 at PP 1, 3–4, JA___, ___–___; *see also, e.g.*, *id.* P 322 (requiring market operators to implement "metering and accounting practices as needed to address the complexities of implementing the requirement that the sale of electric energy from the [wholesale] markets to an electric storage resource that the resource then resells back to those markets be at the wholesale [rate]"), JA___.

Further, like the demand response rule in *Electric Power Supply Association*, the Rule here "addresses—and addresses only— transactions occurring on the wholesale market." Order 841-A at P 44

(quoting *Elec. Power Supply Ass'n*, 136 S. Ct. at 776), JA___.  It covers only sales in the regional wholesale markets subject to Commission jurisdiction, *id*. PP 6, 46, 59, JA___, ___, ___, and avoids specifying any terms for sale at retail—i.e., it does not address "what retail customers may do with energy purchased at retail," *id*. PP 38, 46, JA___, ___.  And the Rule requires market operators to account for ways in which storage resources can interact physically with the wholesale market—e.g., their "bidirectional capability" to both inject energy *to* the grid and receive energy *from* the grid for resale back into the wholesale market (both of which involve wholesale transactions).  Order 841 at P 32, JA___; *see also* Order 841-A at P 49, JA___.

"What is more, the Commission's justifications for regulating [electric storage] are all about, and only about, improving the wholesale market." *Elec. Power Supply Ass'n*, 136 S. Ct. at 776.  The Rule seeks to enhance the functioning of wholesale markets by removing barriers to the participation of resources that can engage in wholesale sales of energy—an objective "at the very core of the Commission's jurisdictional responsibilities."  Order 841-A at P 39, JA___; *see also* Order 841 at PP 19–20 (finding that existing market rules presented barriers to the

participation of electric storage resources in wholesale markets, to the detriment of wholesale market participants), JA___–___.

In short, by regulating only transactions for electricity at wholesale and, in doing so, targeting only the wholesale markets, the Rule executes FERC's "responsibility … to regulate the interstate wholesale market for electricity." *Elec. Power Supply Ass'n*, 136 S. Ct. at 773.

## B.    The Rule expressly leaves to the States regulation of distribution facilities

The next question is whether the Rule targets and directly regulates local distribution facilities in violation of 16 U.S.C. § 824(b)(1). *Elec. Power Supply Ass'n*, 136 S. Ct. at 775. Because it does not, the Rule is a lawful exercise of Commission authority. *See id*. at 775–79.

### 1.    The Commission acts lawfully in regulating wholesale transactions occurring over distribution facilities

Section 201(b)(1) of the Federal Power Act, 16 U.S.C. § 824(b)(1), deprives the Commission of jurisdiction over retail sales and, "except as specifically provided" in the Act, "over facilities used for the generation of electric energy or over facilities used in local distribution or only for

the transmission of electric energy in intrastate commerce …." *See also Elec. Power Supply Ass'n*, 136 S. Ct. at 775. But the Commission's statutory authority over wholesale sales and practices affecting wholesale rates, 16 U.S.C. §§ 824(b)(1), 824d(a), 824e(a), holds even when its actions implicate distribution facilities. *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 696 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1. As this Court has explained, "*all* aspects of wholesale sales are subject to federal regulation, *regardless of the facilities used.*" *Id.* (emphasis added); *see also Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1280 (D.C. Cir. 2007) (explaining that FERC properly regulates transactions occurring over distribution facilities where such regulation is "[]tethered to the Commission's authority over interstate transmissions and wholesale sales"); Order 841-A at P 48 n.134, JA___.

The Commission oversteps its authority, however, if it targets and directly regulates an area of exclusive state concern (e.g., retail sales and distribution facilities). 16 U.S.C. § 824(b)(1); *see, e.g., Elec. Power Supply Ass'n*, 136 S. Ct. at 777 (explaining that FERC may not "set actual [retail] rates"); *Detroit Edison v. FERC*, 334 F.3d 48, 53–54 (D.C.

Cir. 2003) (rejecting FERC regulation of retail service provided by local distribution facilities); *see also* Order 841-A at PP 38–39, JA___–___.

But mere incidental *effects* on retail rates and non-jurisdictional distribution facilities cannot be confused with verboten *regulation* of those rates and facilities. *See* State Br. 32 (listing purported impacts of the Rule on local or state programs, including eliminating state options on storage participation and requiring changes to state regulations). FERC's authority to regulate in its own sphere (e.g., sales for resale and practices directly affecting wholesale rates) is not encumbered by the fact that federal regulation often results in effects elsewhere. Order 841-A at PP 39, 43–44, JA___, ___–__.

*Electric Power Supply Association* sums it up well: "When FERC regulates what takes place on the wholesale market, as part of carrying out its charge to improve how that market runs, then no matter the effect on [the State's core area of jurisdiction], § 824(b) imposes no bar." 136 S. Ct. at 776; *see also id.* ("It is a fact of economic life that the wholesale and retail markets in electricity, as in every other known product, are not hermetically sealed from each other.").

This Court's precedent described above—which neither opening brief addresses—draws a contrast between regulation of activities and entities on the States' side of the Federal Power Act's jurisdictional line and regulation of wholesale transactions that merely *affect* the State sphere. In *Transmission Agency of Northern California*, the Court held that the Commission unlawfully ordered a non-jurisdictional municipality to pay refunds because, in doing so, it directly regulated an entity the Federal Power Act deemed exempt from FERC's jurisdiction. 495 F.3d at 673–74. So too in *Detroit Edison*: The Commission unlawfully asserted authority over retail service provided by local distribution facilities, even going so far as setting the rates for retail service occurring over those facilities. 334 F.3d at 53–54; *cf. Duke Power Co. v. FPC,* 401 F.2d 930, 939–42, 950 (D.C. Cir. 1968) (invalidating Commission's assertion of jurisdiction over a public utility's acquisition of local distribution facilities under 16 U.S.C. § 824b(a), relying in part on the jurisdictional limitation of section 824(b)(1)).

No such problem in *National Association*. The Commission order there lawfully regulated and targeted wholesale transactions—

interconnections for the purpose of making wholesale sales of electric energy—even where they occurred over distribution facilities. *See Nat'l Ass'n*, 475 F.3d at 1280–82 (finding that "jurisdiction over specified [wholesale] transactions … is not per se an exercise of jurisdiction over the facility"); *see also Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003-C, 111 FERC ¶ 61,401, at PP 51–52 (2005) (explaining that its order reflected the Commission's "[Federal Power Act] jurisdiction over wholesale sales which require the use of 'local distribution' facilities"), *aff'd by Nat'l Ass'n*.  It mattered not that FERC's action "impinge[d] as a practical matter on the behavior of non-jurisdictional" facilities, or even that it extended to regulating construction necessary to execute the interconnections.[9]  475 F.3d at 1280, 1281–82; *see also Detroit Edison*, 334 F.3d at 51 (explaining that "when a local distribution facility is used in a wholesale transaction,

---

[9]      For the same reason, the exemption for electric cooperatives and governmental entities in 16 U.S.C. § 824(f) does not help Utility Petitioners, *see* Br. 16 n.8, because this Court has rejected attempts to conflate regulation of transactions with regulation of the facilities over which those transactions occur.  *See Nat'l Ass'n*, 475 F.3d at 1281 (rejecting such an argument based on section 824(f)).

FERC has jurisdiction over that transaction pursuant to its wholesale jurisdiction under [Federal Power Act] § 201(b)(1)").

### 2. The Rule does not regulate and target distribution facilities

The Rule's provisions make plain that the Commission has not regulated and targeted distribution facilities. First, the Rule establishes no right-of-access to distribution facilities or "to the distribution system itself." Order 841-A at PP 47–48, JA___–__. It neither requires States "to allow local storage resources to use distribution facilities to access [wholesale] markets," nor otherwise "commandeer[s]" States into doing anything. *See* State Br. 31–33 & n.71; *see also Nat'l Ass'n*, 475 F.3d at 1283 (finding that FERC orders did not commandeer States because they "explicitly leave state law untouched" and "completely undisturbed"); Order 841-A at P 48 n.134 (citing *Nat'l Ass'n*), JA___.

Nor does the Rule require distributed storage resources to participate in wholesale markets, *see* Order 841-A at P 59, JA___, specify any terms of sale at the retail level, *id.* P 38, JA___, or change distribution utilities' ability to allocate costs they incur in operating and maintaining their power systems due to the Rule, *id.* P 45, JA___.

Second, the Rule avoids regulating distribution systems. *Id.* PP 42, 48, JA___, ___; *see, e.g.*, State Br. 28–29; Utility Br. 34. Distribution utilities, subject to state regulatory requirements, remain responsible for maintaining the safety and reliability of distribution facilities. Order 841 at P 36, JA___; Order 841-A at P 45, JA___. A storage resource would not even qualify under the Rule unless it had the requisite permits and documentation to ensure its ability to inject energy back to the grid and engage in wholesale sales. Order 841-A at P 42, JA___.

And the Rule is unequivocal that States retain plenary power over the "'design, operations, power quality, reliability, and system costs'" of distribution systems. *Id.* (quoting Order 841 at P 36, JA___). That includes all aspects of state-jurisdictional interconnections with distribution facilities, such as "technical requirements" in interconnection agreements that States may deem necessary to "safeguard against reliability or safety concerns." *Id.* (discussing "utility curtailment and anti-islanding provisions, or requirements to install equipment that forces resources to trip offline during extreme frequency, voltage, or fault current incidents"). Thus, the Rule

expressly does not relieve electric storage resources of obligations to "comply with any applicable interconnection and operating requirements." Order 841-A at PP 42, 46, JA___, ___.

Lest there be any doubt about States' preserved powers, the Rule emphasizes that "where electric storage resources interconnected with the distribution system are participating in [wholesale] markets, *it will be under circumstances that are consistent with states' authority to regulate the distribution system.*" *Id.* P 48 (emphasis added), JA___. Put succinctly, any authority States had to regulate their distribution systems before the Rule, they retain after the Rule.

In fact, the Rule offers even more solicitude to the States in two ways. First, it expressly allows States to force would-be participants in state retail electric storage programs to choose between participating in either the retail market or the wholesale market. *See* Order 841-A at P 41 ("[S]tates have the authority to include conditions in their own retail distributed energy resource or retail electric storage resource programs that prohibit any participating resources from also selling into the [wholesale] markets."), JA___. Second, nothing in the Rule prevents States from proscribing (in the terms and conditions of retail

service) the resale of energy purchased under a retail tariff. *Id*. P 46 n.125 (responding to concern that retail customers could attempt to purchase energy under state-regulated retail tariffs and then resell that energy into FERC-jurisdictional wholesale markets), JA___.

These Rule provisions reflect a lighter touch than the FERC order upheld in *National Association*. There, the Commission required distribution facilities to adopt interconnection agreements with electric generators to facilitate those generators' wholesale transactions. 475 F.3d at 1279–80; Order 2003-C, 111 FERC ¶ 61,401, at PP 51–52. The order even prescribed "certain facets of the engineering and construction of facilities needed for the relevant transmissions." *Nat'l Ass'n*, 475 F.3d at 1280.

But here, the Commission neither mandates access to distribution facilities nor regulates the infrastructure of such facilities—States' authority in these areas is unchanged. *See* Order 841-A at PP 42, 47, 48, JA___, ___, ___. Indeed, the Rule's only constraint on preexisting state power has no direct bearing on distribution systems *at all*. States simply may not "take away" distributed storage resources' voluntary

choice "by broadly prohibiting" their participation in wholesale markets. Order 841-A at P 41, JA___.

Utility Petitioners also err in asserting that the Rule creates an amorphous new "reasonably related" standard for what States may or may not do. Br. 30–31. Actually, the Rule provides an illustrative list of examples showing that States retain their preexisting authority over distribution facilities, and merely clarifies that a *categorical* prohibition on participation *in the wholesale markets* would fall outside that authority. *See* Order 841-A at P 42, JA___; *see also Nat'l Ass'n*, 475 F.3d at 1280–82; *Transmission Access*, 225 F.3d at 696.

"In sum, whatever the effects [on distribution facilities], every aspect of the [Rule] happens exclusively on the wholesale market and governs exclusively that market's rules." *Elec. Power Supply Ass'n*, 136 S. Ct. at 776. It is therefore a lawful exercise of Commission authority. *See id*. at 774–79.

3. **The Commission's authority to determine eligibility to transact at wholesale does not regulate and target distribution facilities**

Petitioners nevertheless contend that States—not the Commission—get to decide whether distributed storage may enter the

wholesale markets at all (i.e., the "'whether' of participation").  Utility

Br. 16–17; *cf.* State Br. 18–19, 25 (comparing electric storage resources

to children, state regulators to parents, and FERC to a heavy-handed

operator of a daycare center).  By Petitioners' telling, States have the

power to leave FERC with "nothing to regulate" by simply blocking

distributed storage resources from making wholesale transactions.

Utility Br. 24, 29; *see also* State Br. 15 ("[I]f there are no such

[wholesale] sales, then clearly there is no FERC jurisdiction."); Order

841-A, Dissent at P 5 ("There is no doubt that the participation of

[distributed storage] can 'affect wholesale rates,' but in order to 'affect'

wholesale rates such [resources] must first have access to the wholesale

market …."), JA___.

    Not so.  The Commission reasonably found that "a fundamental

component" of its statutory jurisdiction is the authority "to determine

which resources are eligible to participate in the [wholesale] markets."

Order 841-A at P 38, JA___; *see also City of Arlington*, 569 U.S. at 301–

04 (holding that an agency's interpretation of the scope of its

jurisdiction is entitled to *Chevron* deference); *Advanced Energy Econ.*,

161 FERC ¶ 61,245, at PP 60–61 (2017) (finding that the Commission

"may set the terms of transactions occurring in the … wholesale markets, *including which resources are eligible to participate*, to ensure the reasonableness of wholesale prices and the reliability of the interstate grid") (emphasis added) (cited in Order 841-A at P 37, JA___).

One of the Utility Petitioners (Edison Electric Institute) agreed, stating in its rehearing brief to FERC that "the Commission has exclusive jurisdiction over the market rules *for participation in the wholesale markets* of distribution connected resources …."  Edison Electric Institute Request for Reh'g at 4 (emphasis added), JA___; *see also* Arkansas Supplemental Cmts., FERC Dkt. Nos. RM16-23-000, *et al.*, at 2 (Mar. 15, 2019) (acknowledging, in comments on distributed energy resource aggregation proposal, that the Commission "has authority over [FERC-jurisdictional wholesale market] eligibility rules"), R.242, JA___.

The Commission's interpretation of its jurisdiction is nothing new; "this particular camel has long since entered—indeed, ransacked—the tent." *Connecticut*, 569 F.3d at 483.  In *Transmission Agency of Northern California*, this Court explained that "FERC's jurisdiction extend[s] to non-jurisdictional entities … insofar as FERC ha[s]

47

authority to *dictate the terms of their participation in jurisdictional services or transactions*." 495 F.3d at 675 n.9 (emphasis added) (describing the Court's holding in *National Association*, 475 F.3d at 1279–81); *see also* Order 841-A at P 38, JA___; *Advanced Energy Econ.*, 161 FERC ¶ 61,245, at PP 60–61. And if the Commission properly asserts authority over *non-jurisdictional* entities' participation in making wholesale sales (as *Transmission Agency* confirms), it is all the more clear that the Commission lawfully exercises power over *jurisdictional* entities' (e.g., distributed storage resources) transactions at wholesale. *See, e.g.*, Order 841-A at P 51 & n.142 (explaining that an electric storage resource that injects energy back to the grid for purposes of participating in a FERC-jurisdictional wholesale market engages in a sale of electric energy at wholesale in interstate commerce and is therefore a jurisdictional "public utility"), JA___–__; 16 U.S.C. § 824(e) (defining FERC-jurisdictional "public utility").

The Commission's view of its own jurisdiction also offers the most sensible approach. FERC cannot meet its statutory obligation to ensure just and reasonable wholesale rates, 16 U.S.C. § 824e(a), unless it can regulate all wholesale transactions. Petitioners' contrary view would

undermine this charge by allowing States to veto FERC authority whenever a Commission action *affects* an area of state control—a routine occurrence because actions taken in the wholesale markets affect the state sphere, and vice versa. *Elec. Power Supply Ass'n*, 136 S. Ct. at 776.

Indeed, as the congressionally-designated overseer of the wholesale markets, the Commission reasonably found that facilitating participation by electric storage resources would improve the functioning of those markets through, for example, increased competition and lower wholesale rates. Order 841-A at PP 39, 45, 56, JA___, ___, ___; *see also* Order 841 at PP 2, 20 (finding that removing barriers to participation of all eligible electric storage resources will "enhance competition and, in turn, help to ensure that the [FERC-jurisdictional wholesale] markets produce just and reasonable rates"), JA___, ___.

Consistent with this finding, at least some Utility Petitioners, in their filings with FERC, embraced the benefits to wholesale markets from the participation of storage resources. *See* Am. Mun. Power, Inc., *et al.*, Request for Reh'g, FERC Dkt. Nos. RM16-23-000, *et al.*, at 2

(Mar. 19, 2018) ("Storage has the potential to provide significant benefits to the interstate transmission grid and wholesale electric customers—but also to local distribution systems and retail electric customers."), R.224, JA___; *id.* ("public power and cooperative utilities and the consumers they serve may benefit if the market value of [storage] resources can be recognized").  And all Petitioners here concede that wholesale transactions by storage resources directly affect wholesale rates—and that the Commission's determination to facilitate participation by storage resources in the wholesale markets is an appropriate exercise of federal authority.  *See* Utility Br. 16; State Br. 15–16, 25.

On appeal, Petitioners nevertheless note that the Commission's demand response rule in *Electric Power Supply Association* granted States an "opt-out" from allowing retail demand response providers to participate in wholesale markets.  *See* Utility Br. 23–24; State Br. 23–24.  But the opt-out there was not determinative of the Court's holding. Utility Br. 23–24; State Br. 23–24; *Elec. Power Supply Ass'n*, 136 S. Ct. at 776–80.

The Court instead labeled the opt-out a policy choice—a "notable solicitude toward the States," in recognition of "the linkage between wholesale and retail markets and the States' role in overseeing retail sales." 136 S. Ct. at 779. Nowhere did the Court suggest that FERC's authority to implement the program depended, as a *legal* matter, on including a State veto of FERC rules governing wholesale demand response. *See id.* at 779–80; Order 841-A at P 40, JA___. Rather, the Court's determination that FERC acted lawfully flowed from its conclusions that: (1) regulating wholesale demand response is a practice directly affecting wholesale rates (undisputed when it comes to regulating storage here); and (2) such wholesale regulation does not directly regulate retail rates. 136 S. Ct. at 773, 776–79; *see also id.* at 779 (finding the opt-out was merely a "finishing blow" to the argument that the Commission acted outside of its authority).

Utility Petitioners (Br. 18) also rely on this Court's passing reference to States retaining "the right to forbid new [generation] entrants from providing new capacity" into wholesale markets. *Connecticut*, 569 F.3d at 481. But that dictum cannot overcome this Court's holdings that FERC properly regulates jurisdictional

transactions occurring over distribution facilities—by, among other things, "dictat[ing] the terms of [non-jurisdictional entities'] participation in [those] jurisdictional services or transactions." *Transmission Agency of N. Cal.*, 495 F.3d at 675 n.9; *see also Nat'l Ass'n*, 475 F.3d at 1280–82; *Transmission Access*, 225 F.3d at 696.

Utilities' reliance on *Connecticut* is also strange considering its holding confirms the precedent described above that refutes Petitioners' legal position:  no violation of 16 U.S.C. § 824(b)(1) because FERC's rule there (an "installed capacity requirement") did not directly regulate non-jurisdictional facilities.  569 F.3d at 481–82; *see also New Eng. Power Generators Ass'n, Inc. v. FERC*, 757 F.3d 283, 290 (D.C. Cir. 2014) ("We have previously held that the Commission has jurisdiction to regulate certain parameters of the capacity market related to the price of capacity, even if those determinations touch on states' authority.") (citing *Connecticut*, 569 F.3d at 481–83).

*         *         *

The Federal Power Act preserves for States authority to regulate distribution facilities.  But States cannot leverage that power into jurisdiction over wholesale sales by entities that *use* those facilities.  *See*

Order 841-A at P 38, JA___.  And for good reason.  A contrary rule would undermine Congress's express intent that the *Commission* exercise exclusive jurisdiction over wholesale sales and practices directly affecting wholesale rates.  Because the Rule operates within the Commission's regulatory field, and does so without intruding on the States' own, the Rule reflects the Commission's lawful exercise of its authority.  That power is not subject to a State veto.

## IV. A hypothetical state prohibition on distributed storage participation in wholesale markets would target wholesale sales and likely be preempted

Petitioners insist that the Federal Power Act compels the Commission to permit broad state prohibitions on distribution-level electric storage resources' participation in wholesale energy markets.  Utility Br. 8–10, 19, 29, 34; State Br. 11, 16.  As to whether such a hypothetical state action would be preempted, the parties here agree on one thing:  Preemption turns on the subject or target of the state action, not its effects.  *See, e.g.*, Utility Br. 20 ("The *EPSA* focus on the subject of the regulation follows a consistent judicial approach in determining whether state action affecting wholesale markets cross [Federal Power Act] jurisdictional boundaries."); *id*. at 21 (noting the cases' "focus on

the subject of the regulation"); *Oneok*, 575 U.S. at 385 ("Those

precedents emphasize the importance of considering the *target* at which

the state law *aims* in determining whether that law is pre-empted.")

(emphasis in original); Order 841-A at P 41 & n.112 (collecting cases),

JA___, ___.

But Petitioners miss the mark in presuming that an unequivocal

prohibition on distributed storage participation in the wholesale market

"would target" an area of exclusive state concern:  retail electric

customers and sales, and local distribution facilities.  Utility Br. 22; *see

also* State Br. 16.  As the Commission explained, a hypothetical state

law—e.g., legislation, rule, or administrative order—categorically

barring distributed storage wholesale transactions "aim[s] *directly* at

the [wholesale] markets" subject to FERC's exclusive jurisdiction and,

accordingly, "would intrude on" that exclusive federal field.  Order

841-A at PP 41 & n.112, 47 & n.128, JA ___–__, ___–__; *see also id.* P 37

(describing prior FERC order reaching same conclusion), JA ___.

### A. State laws targeting wholesale transactions, even to further a legitimate state end, are preempted

The Supremacy Clause provides that the laws of the United States

are "'the supreme Law of the Land; … any Thing in the Constitution or

Laws of any State to the Contrary notwithstanding.'" *Hughes v. Talen Energy Mktg., LLC,* 136 S. Ct. 1288, 1297 (2016) (quoting U.S. Const., Art. VI, cl. 2).  The Federal Power Act contains no express preemption clause, but a state law may be impliedly preempted under the doctrines of field or conflict preemption.  *Id.*

"A state law is preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law'" (field preemption), *id.* (quoting *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989)), and also "'where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (conflict preemption), *id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).

*Hughes* provides recent guidance on when a state program impermissibly aims at FERC's regulatory turf.  That case concerned a Maryland law guaranteeing power plants a wholesale rate different from the one set by a wholesale market auction and approved by FERC.  *Id.* at 1295.  The Court deemed the Maryland law preempted.  *Id.* at

1298. While the law regulated entities over which States exercise control—generation resources, 16 U.S.C. § 824(b)(1)—it did so in a way that targeted FERC's statutory domain. *Id.*; *see also Elec. Power Supply Ass'n*, 136 S. Ct. at 780 ("The [Federal Power Act] leaves no room either for direct state regulation of the prices of interstate wholesales *or for regulation that would indirectly achieve the same result.*") (emphasis added; internal quotation marks omitted); *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 523–24 (7th Cir. 2018) (upholding Illinois subsidy program for electricity generation because, unlike the Maryland program in *Hughes*, it did not supplement the wholesale market clearing price or require generators to bid into and clear the wholesale auction), *cert. denied*, 139 S. Ct. 1547 (2019); *accord Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 54 (2d Cir. 2018) (same conclusion for New York program), *cert. denied*, 139 S. Ct. 1547 (2019).

*Hughes* draws upon well-established Supreme Court preemption jurisprudence. In *Mississippi*, the Court held that a Mississippi law regulating a practice on the State's side of section 824(b)(1)'s jurisdictional line was preempted. 487 U.S. at 373. That state law

disregarded the Commission's determination that the utility must purchase a certain amount of high-cost power at wholesale: Mississippi set retail rates based on its finding that the utility should have purchased *less* high-cost *wholesale* power. *Id.*

The Court explained that "'[o]nce FERC sets [a wholesale] rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable.'" *Id.* (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 965 (1986)). Instead, it "'must … give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates.'" *Id.* (quoting *Nantahala*, 476 U.S. at 965); *see also Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 48–49 (2003); *cf. Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 308–09 (1988) (deeming state law on corporate capitalization preempted because it targeted FERC-jurisdictional natural gas pipelines, with the goal of lowering their wholesale rates).

Just like the state retail rate-setting preempted in *Mississippi* and *Nantahala*, a hypothetical state prohibition (on all wholesale market participation by distributed storage) would "aim[] *directly* at the [wholesale electricity] markets" and thus "would intrude on" FERC's

57

exclusive jurisdiction over wholesale sales and practices directly affecting wholesale rates.  Order 841-A at PP 41 & n.112, 47 & n.128, JA\_\_\_–\_\_, \_\_\_–\_\_; *see also id.* P 38 (describing FERC's exclusive jurisdiction), JA\_\_\_.

In fact, the case for preemption of such a state law is even stronger here than it was in *Mississippi* and *Nantahala*.  There, the prohibited state acts at least regulated a practice on the States' side of section 824(b)(1)'s jurisdictional line (retail rates).  Not so here:  The state prohibition Petitioners contemplate would directly regulate wholesale transactions, thereby striking at the heart of the Commission's Federal Power Act authority.  *See* Order 841-A at PP 41 & n.112, 47 & n.128, JA\_\_\_–\_\_, \_\_\_–\_\_; *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478 (4th Cir. 2014) (deeming Maryland's setting of "terms and prices" for entities engaging in wholesale auction-based sales as "strik[ing] at the heart of [FERC's] statutory power"), *aff'd sub nom. Hughes*, 136 S. Ct. 1288; *see also Nat'l Ass'n*, 475 F.3d at 1280–82 (holding that FERC has authority to regulate wholesale transactions occurring over state-regulated distribution systems).

Cases upholding state actions targeting States' exclusive zone of jurisdiction are, by contrast, a poor fit here. *See, e.g.*, Utility Br. 21–22, 24 (relying on *Northwest Central*). In *Northwest Central*, the Supreme Court found no preemption of a Kansas regulation of natural gas production because it both regulated an activity on the State's side of the Natural Gas Act's jurisdictional line ("rates of production") and targeted an area of state concern ("the conservation of natural resources and the protection of correlative rights"). 489 U.S. at 496, 512–14; *see also Oneok*, 575 U.S. at 378–79. These facts distinguished *Northwest Central* from another case where Kansas directly regulated *wholesale purchases* of natural gas—an area of exclusive federal control. *See* 15 U.S.C. § 717(b); *Northern Natural Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 85–86, 92, 94 (1963).

Further, that States may be pursuing "legitimate policy goals"— here, "maintain[ing] reliability or … ensur[ing] that [distribution] system costs are reasonable"—is legally irrelevant. *See* State Br. 29. The Supreme Court has repeatedly held that States "may not seek to achieve ends, *however legitimate*, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Hughes*,

136 S. Ct. at 1290–91 (emphasis added); *see also Northern Natural*, 372 U.S. at 93 ("We have already held that a purpose, *however legitimate* … does not warrant direct interference by the States with the prices of natural gas wholesales in interstate commerce.") (emphasis added).

Utility Petitioners also analogize to decisions in other areas that, if anything, support preempting their favored hypothetical State rule. *See, e.g.*, Utility Br. 22, 27–28, 34. Both Supreme Court decisions they cite concerning the Atomic Energy Act turned aside preemption challenges to state laws banning practices not covered by that federal statute. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901–02 (2019) (Virginia ban on uranium mining); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 198, 222–23 (1983) ("*PG&E*") (California ban on construction of nuclear power plants). But here, the Commission is regulating a practice the Federal Power Act reserves to *FERC*, *not* the States—wholesale transactions by distributed storage resources. *See supra* at 36–48.

Utility Petitioners' horsemeat cases similarly offer nothing worth consuming. Utility Br. 28–29. *Cavel International, Inc. v. Madigan* distinguished between exclusive federal control over *how* meat is

processed from state authority over *whether* to produce the meat in the first place.  500 F.3d 551, 554 (7th Cir. 2007); *see also Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007) (substantially similar in relevant part).  But just as the States in *PG&E*, *Cavel*, and *Empacadora* were free to decide whether to authorize the building of new nuclear power plants or the production and sale of horsemeat, the Rule here leaves States free to regulate distribution systems—e.g., to decide whether to require upgrades or installation of certain technologies to mitigate safety or reliability concerns.  Order No. 841-A at PP 42, 46, JA___, ___.

## B. A broad prohibition would likely conflict with the important federal policy of promoting competition to ensure just and reasonable wholesale rates

Beyond being field-preempted, a broad state prohibition of wholesale market participation by distributed storage resources would also likely be conflict-preempted.  Conflict preemption applies "where the state law at issue conflicts with federal law, either because it is impossible to comply with both, or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives."  *Northwest Central*, 489 U.S. at 509 (internal citations

omitted).  A state law "may be preempted as conflicting with FERC's authority over interstate transportation and rates if," among other things, "state regulation prevents attainment of FERC's goals."  *Id.* at 516; *see also Oneok*, 575 U.S. at 390 (acknowledging that conflict preemption is not foreclosed just because the state action at issue was not field preempted).

Here, the Commission explained that existing wholesale market rules had failed to "efficiently dispatch … electric storage resources, thereby reducing competition in [those] markets."  Order 841 at P 12, JA___.  It concluded that accommodating and integrating "emerging technologies" like electric storage into wholesale markets "would enhance competition and, in turn, help to ensure that these markets produce just and reasonable rates."  *Id.* PP 1, 10, 12, 19–20, JA___, ___, ___, ___–___.  Further, the Commission explained that new market rules should accommodate *all* eligible storage resources, regardless of their physical location.  *See, e.g.*, Order 841-A at PP 45, 56, JA___, ___; Order 841 at P 29, JA___.  Facilitating such participation accommodates a diverse array of storage technologies, while also maximizing the cost-saving gains of increased competition.  *See, e.g.*,

Order 841-A at PP 45, 56, JA___, ___; Order 841 at PP 2, 20, 29, JA___, ___, ___.

State laws preventing a subset of storage resources from entering the wholesale markets would erode these efforts to foster competition and ensure just and reasonable rates. As the Fourth Circuit explained in *Nazarian*, "[c]ircumventing and displacing federal rules in this fashion is not permissible." 753 F.3d at 479. Indeed, such action would amount to "an effort by the state to directly override [FERC's] explicit policy choice." *Id.* This conclusion is reinforced by the fact that such a state action also would invade FERC's exclusive jurisdiction over wholesale sales, creating an inevitable conflict with FERC's authority over those transactions. *See id.* at 478; *see also Hughes*, 136 S. Ct. at 1298–99 (affirming *Nazarian*).

## V. The Commission's rule is not arbitrary and capricious

Utility Petitioners and Intervenor Transmission Access Policy Study Group ("Transmission Access") also argue that the Commission's Rule is arbitrary and capricious. Utility Br. 35–37; Transmission Access Br. 11–20. In their view, the Rule marks an unreasoned

departure from a separate FERC rule and unreasonably burdens States and distribution utilities.

In fact, the Commission gave a full explanation, tethered to substantial record evidence, for not allowing States to veto its lawful exercise of authority to set the terms of wholesale participation by distributed storage resources.

First, the Commission reasonably found that allowing *all* eligible electric storage to participate in wholesale markets promotes just and reasonable wholesale rates. *See, e.g.*, Order 841-A at PP 45, 56, JA\_\_\_, \_\_\_; Order 841 at PP 2, 20, JA\_\_\_, \_\_\_; *Elec. Power Supply Ass'n*, 136 S. Ct. at 773–74 (citing 16 U.S.C. §§ 824d(a), 824e(a)). It explained, for example, that allowing distributed storage to transact at wholesale will promote "greater participation of electric storage resources in [wholesale] markets," thereby increasing competition, which could lower prices. *See, e.g.*, Order 841-A at PP 45, 56 (explaining that because "the benefits of removing barriers to the participation of electric storage resources in [wholesale] markets are significant," the Commission was "not persuaded to adopt an opt-out that could limit that participation"), JA\_\_\_, \_\_\_; *see also* Order 841 at PP 2, 20, JA\_\_\_, \_\_\_; Am. Mun. Power,

Inc., *et al.*, Request for Reh'g at 2, JA\_\_\_. The Commission also concluded that a broader definition of resources covered by the Rule, which includes distributed storage, would "ensur[e] that the market rules will not be designed for any particular electric storage technology." Order 841 at P 29, JA\_\_\_.

It follows that the converse is also true—allowing States to bar such participation would undercut FERC's statutory charge of ensuring that wholesale markets "produce just and reasonable rates." *See* Order 841-A at PP 37–38, 41, 47, JA\_\_\_–\_\_\_, \_\_\_, \_\_\_; *see also* Order 841 at PP 2, 20, JA\_\_\_, \_\_\_; 16 U.S.C. §§ 824d(a), 824e(a); *Advanced Energy Econ.*, 163 FERC ¶ 61,030, at PP 6, 37–38 (declining to grant a State opt-out for energy efficiency transactions in order to protect the Commission's ability to ensure just and reasonable rates).

These Commission findings, based on a reasonable assessment of wholesale market dynamics, are entitled to deference. *See, e.g.*, *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 370 (D.C. Cir. 1998) (explaining that the Court "ordinarily defer[s]" to a "reasonable agency prediction about the future impact of its own regulatory policies"); *Envtl. Action, Inc. v. FERC,* 939 F.2d 1057, 1064 (D.C. Cir. 1991) ("[I]t

is within the scope of the agency's expertise to make … a prediction about the market it regulates, and a reasonable prediction deserves our deference ….").

Second, the Commission provided ample explanation distinguishing the demand response rule, so there was no unreasoned departure from prior agency policy.[10] *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis ….") (internal quotation marks omitted); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004); Utility Br. 35–37 (claiming unreasoned departure from demand response rule); Transmission Access Br. 16–20 (same). Unlike demand response transactions, which involve withholding energy consumption, electric storage transactions involve *actual sales* of energy. Order 841-A at P 51, JA___. Thus, their

---

[10] Under FERC Order No. 719 and Order No. 745—the demand response rule addressed in *Electric Power Supply Association*—the Commission allowed States to bar retail-side demand response resources from transacting at wholesale. *Elec. Power Supply Ass'n*, 136 S. Ct. at 779–80.

transactions at wholesale hew closer to the Commission's core mandate of regulating wholesale sales.  *See id.*; Order 841 at P 30, JA___.

Also unlike demand response, States and distribution utilities lack a longstanding history of managing and regulating electric storage resource programs.  Order 841-A at P 52, JA___.  The Commission explained that absent an opt-out, certain demand-response resources could exit existing retail programs in favor of the Commission's new wholesale initiative, thereby depriving distribution utilities of an existing means of maintaining reasonable rates for their customers.  *Id.*

By contrast, the few preexisting state policies on electric storage resources were implemented fairly recently.  *Id.*  Indeed, "among the many comments on the [Notice of Proposed Rulemaking] submitted by various state agencies and representatives, only California, Connecticut, Massachusetts and New York mentioned any specific state electric storage initiatives."  *Id.* P 52 n.145, JA___.  Thus, notwithstanding Transmission Access' vague allusions to storage projects occurring in two other States and to experimentation by States and localities, Transmission Access Br. 19, the Commission reasonably found that the Rule on review carries less potential to disrupt state

programs than did the demand response rule.  *See* Order 841-A at P 52, JA___.  Most States to offer comments appear to agree.  *See supra* at 12.

Third, Utility Petitioners' claim of the Rule's purported impacts to distribution systems ignores what the Rule actually says.  Utility Br. 37; *see also* Transmission Access Br. 11–15.  The Rule expressly does "not impos[e] any new requirements on distribution utilities to enable the participation of electric storage resources in [wholesale] markets."  Order 841-A at P 45, JA___; *see also supra* at 41–42.  Nor does it "'mandate'" that electric storage resources "'be permitted to use distribution facilities so that they may access the wholesale market,'" Order 841-A at P 47 (quoting Dissent at P 5, JA___), JA___, or "'hav[e] the effect of directing that [electric storage resources] have access to distribution facilities,'" *id*. P 48 (quoting Dissent at P 5 n.18, JA___), JA___.  States retain full "authority to regulate the distribution system," including their "'design, operations, power quality, reliability, and system costs.'"  *Id*. PP 47, 48 (quoting Order 841 at P 36, JA___), JA___, ____.  States simply may not "aim *directly* at the [wholesale] markets" by broadly prohibiting distributed storage participation in those markets.  *Id*. P 48 (cleaned up), JA___.

Further, nothing in the Rule changes the ability of distribution utilities "to allocate any costs that they incur in operating and maintaining their respective power systems." *Id*. P 45, JA___. Thus, the Commission acknowledged and did not ignore the potential for increased costs. Transmission Access Br. 14; *see also* Order 841-A at PP 45, 56 (finding that the benefits of allowing electric storage resources broader access to the wholesale market outweigh any policy considerations in favor of an opt-out), JA___, ___.

Finally, to the extent the Rule may result in increased administrative burdens (Transmission Access Br. 12–13), any such burden of tracking resales of electricity purchased at retail would come from a state regulation—e.g., a prohibition on resales of energy purchased under a retail tariff—not from the Rule itself. Order 841-A at P 46 n.125, JA___. As for tracking electricity purchased at wholesale, any such burden would fall on wholesale market operators, not distribution utilities, with the option of using alternative—e.g., state-administered—tracking mechanisms. Order 841 at PP 322–24, JA___–__.

*     *     *

Utility Petitioners' and Transmission Access' real quarrel is with the Commission's policy choice declining to disclaim jurisdiction over distributed storage wholesale transactions. But this sort of policy disagreement is no basis for invalidating the Commission's considered judgment—particularly in a technical area like wholesale market design. *See Elec. Power Supply Ass'n*, 136 S. Ct. at 782 (holding that judicial review is limited to whether the Commission has "examined the relevant *considerations*," not whether it reached the best policy outcome) (emphasis added) (internal quotation marks and adjustments omitted). Because "the Commission addressed the issue" of a state opt-out "seriously and carefully," its decision is not arbitrary and capricious. *Id*. at 784 (cleaned up).

## CONCLUSION

The petitions for review should be dismissed for lack of standing or ripeness. If the Court proceeds to the merits, it should deny the petitions.

Respectfully submitted,

James P. Danly
General Counsel

Robert H. Solomon
Solicitor

*/s/ Anand R. Viswanathan*
Anand R. Viswanathan
Jared B. Fish
Attorneys

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-6537
Fax: (202) 273-0901
E-mail: Anand.Viswanathan@ferc.gov

January 31, 2020

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,161 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Anand R. Viswanathan*
Anand R. Viswanathan
Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-6537
Fax: (202) 273-0901
E-mail: Anand.Viswanathan@ferc.gov

January 31, 2020

# ADDENDUM

## STATUTES
## AND
## REGULATIONS

# TABLE OF CONTENTS

**STATUTES**:                                                                                    **PAGE**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ............................................................................ A-1

Federal Power Act

    Section 201, 16 U.S.C. § 824 ......................................................... A-2

    Section 203, 16 U.S.C. § 824b ...................................................... A-4

    Section 205, 16 U.S.C. § 824d ...................................................... A-6

    Section 206, 16 U.S.C. § 824e ...................................................... A-8

Natural Gas Act

    Section 1, 15 U.S.C. § 717 ......................................................... A-10

**REGULATION:**

    18 C.F.R. § 35.28 ....................................................................... A-12



Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
| --- | --- | --- |
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
| --- | --- | --- |
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
| --- | --- | --- |
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

# CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.　Congressional review.
802.　Congressional disapproval procedure.
803.　Special rule on statutory, regulatory, and judicial deadlines.
804.　Definitions.
805.　Judicial review.
806.　Applicability; severability.
807.　Exemption for monetary policy.
808.　Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency pro-



conducted over the term of the existing license; and

(B) were not expressly considered by the Commission as contributing to the length of the existing license term in any order establishing or extending the existing license term.

**(c) Commission determination**

At the request of the licensee, the Commission shall make a determination as to whether any planned, ongoing, or completed investment meets the criteria under subsection (b)(2). Any determination under this subsection shall be issued within 60 days following receipt of the licensee's request. When issuing its determination under this subsection, the Commission shall not assess the incremental number of years that the investment may add to the new license term. All such assessment shall occur only as provided in subsection (a).

(June 10, 1920, ch. 285, pt. I, § 36, as added Pub. L. 115–270, title III, § 3005, Oct. 23, 2018, 132 Stat. 3867.)

SUBCHAPTER II—REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**§ 824. Declaration of policy; application of subchapter**

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j,

824j–1, 824k, 824*o*, 824*o*–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824*o*–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824*o*, 824*o*–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate com-

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

pany or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, §201, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 847; amended Pub. L. 95–617, title II, §204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, §714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title III, §§1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub. L. 114–94, div. F, §61003(b), Dec. 4, 2015, 129 Stat. 1778.)

REFERENCES IN TEXT

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, as amended, which is classified generally to chapter 31 (§901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

AMENDMENTS

2015—Subsec. (b)(2). Pub. L. 114–94, §61003(b)(1), inserted "824o–1," after "824o," in two places.

Subsec. (e). Pub. L. 114–94, §61003(b)(2), inserted "824o–1," after "824o,".

2005—Subsec. (b)(2). Pub. L. 109–58, §1295(a)(1), substituted "Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title" for "The provisions of sections 824i, 824j, and 824k of this title" and "Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "Compliance with any order of the Commission under the provisions of section 824i or 824j of this title".

Subsec. (e). Pub. L. 109–58, §1295(a)(2), substituted "section 824e(e), 824f, 824i, 824j, 824j–1, 824k, 824o, 824p,

824q, 824r, 824s, 824t, 824u, or 824v of this title" for "section 824i, 824j, or 824k of this title".

Subsec. (f). Pub. L. 109–58, §1291(c), which directed amendment of subsec. (f) by substituting "political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year," for "political subdivision of a state,", was executed by making the substitution for "political subdivision of a State," to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, §1277(b)(1), substituted "2005" for "1935".

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, §204(b)(1), designated existing provisions as par. (1), inserted "except as provided in paragraph (2)" after "in interstate commerce, but", and added par. (2).

Subsec. (e). Pub. L. 95–617, §204(b)(2), inserted "(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)" after "under this subchapter".

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

STATE AUTHORITIES; CONSTRUCTION

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

PRIOR ACTIONS; EFFECT ON OTHER AUTHORITIES

Pub. L. 95–617, title II, §214, Nov. 9, 1978, 92 Stat. 3149, provided that:

"(a) PRIOR ACTIONS.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

"(b) OTHER AUTHORITIES.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title."

§ 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

(a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric en-


priate in the selection of a transmission route. If the transmission route approved by any State does not appear to be feasible and in the public interest, the Secretary shall encourage such State to review such route and to develop a route that is feasible and in the public interest. Any exercise by the Secretary of the power of eminent domain under this section shall be in accordance with other applicable provisions of Federal law. The Secretary shall provide public notice of his intention to acquire any right-of-way before exercising such power of eminent domain with respect to such right-of-way.

**(b) Permit**

Notwithstanding any transfer of functions under the first sentence of section 301(b) of the Department of Energy Organization Act [42 U.S.C. 7151(b)], no permit referred to in subsection (a)(1)(B) may be issued unless the Commission has conducted hearings and made the findings required under section 202(e) of the Federal Power Act [16 U.S.C. 824a(e)] and under the applicable execution order respecting the construction, operation, maintenance, or connection at the borders of the United States of facilities for the transmission of electric energy between the United States and a foreign country. Any finding of the Commission under an applicable executive order referred to in this subsection shall be treated for purposes of judicial review as an order issued under section 202(e) of the Federal Power Act.

**(c) Timely acquisition by other means**

The Secretary may not acquire any rights-of-day[2] under this section unless he determines that the holder or holders of a permit referred to in subsection (a)(1)(B) are unable to acquire such rights-of-way under State condemnation authority, or after reasonable opportunity for negotiation, without unreasonably delaying construction, taking into consideration the impact of such delay on completion of the facilities in a timely fashion.

**(d) Payments by permittees**

(1) The property interest acquired by the Secretary under this section (whether by eminent domain or other purchase) shall be transferred by the Secretary to the holder of a permit referred to in subsection (b) if such holder has made payment to the Secretary of the entire costs of the acquisition of such property interest, including administrative costs. The Secretary may accept, and expend, for purposes of such acquisition, amounts from any such person before acquiring a property interest to be transferred to such person under this section.

(2) If no payment is made by a permit holder under paragraph (1), within a reasonable time, the Secretary shall offer such rights-of-way to the original owner for reacquisition at the original price paid by the Secretary. If such original owner refuses to reacquire such property after a reasonable period, the Secretary shall dispose of such property in accordance with applicable provisions of law governing disposal of property of the United States.

---

[2] So in original. Probably should be "rights-of-way".

**(e) Federal law governing Federal lands**

This section shall not affect any Federal law governing Federal lands.

(Pub. L. 95–617, title VI, §602, Nov. 9, 1978, 92 Stat. 3164.)

CODIFICATION

Subsection (f), which required the Secretary to report annually to Congress on actions taken pursuant to this section, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, page 90 of House Document No. 103–7.

Section was enacted as part of the Public Utility Regulatory Policies Act of 1978, and not as part of the Federal Power Act which generally comprises this chapter.

DEFINITIONS

For definitions of terms used in this section, see section 2602 of this title.

**§ 824b. Disposition of property; consolidations; purchase of securities**

**(a) Authorization**

(1) No public utility shall, without first having secured an order of the Commission authorizing it to do so—

(A) sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $10,000,000;

(B) merge or consolidate, directly or indirectly, such facilities or any part thereof with those of any other person, by any means whatsoever;

(C) purchase, acquire, or take any security with a value in excess of $10,000,000 of any other public utility; or

(D) purchase, lease, or otherwise acquire an existing generation facility—

(i) that has a value in excess of $10,000,000; and

(ii) that is used for interstate wholesale sales and over which the Commission has jurisdiction for ratemaking purposes.

(2) No holding company in a holding company system that includes a transmitting utility or an electric utility shall purchase, acquire, or take any security with a value in excess of $10,000,000 of, or, by any means whatsoever, directly or indirectly, merge or consolidate with, a transmitting utility, an electric utility company, or a holding company in a holding company system that includes a transmitting utility, or an electric utility company, with a value in excess of $10,000,000 without first having secured an order of the Commission authorizing it to do so.

(3) Upon receipt of an application for such approval the Commission shall give reasonable notice in writing to the Governor and State commission of each of the States in which the physical property affected, or any part thereof, is situated, and to such other persons as it may deem advisable.

(4) After notice and opportunity for hearing, the Commission shall approve the proposed disposition, consolidation, acquisition, or change in control, if it finds that the proposed trans-

action will be consistent with the public interest, and will not result in cross-subsidization of a non-utility associate company or the pledge or encumbrance of utility assets for the benefit of an associate company, unless the Commission determines that the cross-subsidization, pledge, or encumbrance will be consistent with the public interest.

(5) The Commission shall, by rule, adopt procedures for the expeditious consideration of applications for the approval of dispositions, consolidations, or acquisitions, under this section. Such rules shall identify classes of transactions, or specify criteria for transactions, that normally meet the standards established in paragraph (4). The Commission shall provide expedited review for such transactions. The Commission shall grant or deny any other application for approval of a transaction not later than 180 days after the application is filed. If the Commission does not act within 180 days, such application shall be deemed granted unless the Commission finds, based on good cause, that further consideration is required to determine whether the proposed transaction meets the standards of paragraph (4) and issues an order tolling the time for acting on the application for not more than 180 days, at the end of which additional period the Commission shall grant or deny the application.

(6) For purposes of this subsection, the terms "associate company", "holding company", and "holding company system" have the meaning given those terms in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(7)(A) Not later than 180 days after September 28, 2018, the Commission shall promulgate a rule requiring any public utility that is seeking to merge or consolidate, directly or indirectly, its facilities subject to the jurisdiction of the Commission, or any part thereof, with those of any other person, to notify the Commission of such transaction not later than 30 days after the date on which the transaction is consummated if—

(i) the facilities, or any part thereof, to be acquired are of a value in excess of $1,000,000; and

(ii) such public utility is not required to secure an order of the Commission under paragraph (1)(B).

(B) In establishing any notification requirement under subparagraph (A), the Commission shall, to the maximum extent practicable, minimize the paperwork burden resulting from the collection of information.

**(b) Orders of Commission**

The Commission may grant any application for an order under this section in whole or in part and upon such terms and conditions as it finds necessary or appropriate to secure the maintenance of adequate service and the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may from time to time for good cause shown make such orders supplemental to any order made under this section as it may find necessary or appropriate.

(June 10, 1920, ch. 285, pt. II, § 203, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 849; amend-

ed Pub. L. 109–58, title XII, § 1289(a), Aug. 8, 2005, 119 Stat. 982; Pub. L. 115–247, §§ 1, 2, Sept. 28, 2018, 132 Stat. 3152.)

AMENDMENT OF SUBSECTION (a)(1)(B)

*Pub. L. 115–247, §§ 1, 3, Sept. 28, 2018, 132 Stat. 3152, provided that, effective 180 days after Sept. 28, 2018, subsection (a)(1) of this section is amended by striking subparagraph (B) and inserting the following:*

*"(B) merge or consolidate, directly or indirectly, its facilities subject to the jurisdiction of the Commission, or any part thereof, with the facilities of any other person, or any part thereof, that are subject to the jurisdiction of the Commission and have a value in excess of $10,000,000, by any means whatsoever;".*

*See 2018 Amendment note below.*

REFERENCES IN TEXT

The Public Utility Holding Company Act of 2005, referred to in subsec. (a)(6), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§ 16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

AMENDMENTS

2018—Subsec. (a)(1)(B). Pub. L. 115–247, § 1, added subpar. (B) and struck out former subpar. (B) which read as follows: "merge or consolidate, directly or indirectly, such facilities or any part thereof with those of any other person, by any means whatsoever;".

Subsec. (a)(7). Pub. L. 115–247, § 2, added par. (7).

2005—Subsec. (a). Pub. L. 109–58 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so. Upon application for such approval the Commission shall give reasonable notice in writing to the Governor and State commission of each of the States in which the physical property affected, or any part thereof, is situated, and to such other persons as it may deem advisable. After notice and opportunity for hearing, if the Commission finds that the proposed disposition, consolidation, acquisition, or control will be consistent with the public interest, it shall approve the same."

EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–247, § 3, Sept. 28, 2018, 132 Stat. 3152, provided that: "The amendment made by section 1 [amending this section] shall take effect 180 days after the date of enactment of this Act [Sept. 28, 2018]."

EFFECTIVE DATE OF 2005 AMENDMENT

Pub. L. 109–58, title XII, § 1289(b), (c), Aug. 8, 2005, 119 Stat. 983, provided that:

"(b) EFFECTIVE DATE.—The amendments made by this section [amending this section] shall take effect 6 months after the date of enactment of this Act [Aug. 8, 2005].

"(c) TRANSITION PROVISION.—The amendments made by subsection (a) [amending this section] shall not apply to any application under section 203 of the Federal Power Act (16 U.S.C. 824b) that was filed on or before the date of enactment of this Act [Aug. 8, 2005]."



### § 824c. Issuance of securities; assumption of liabilities

#### (a) Authorization by Commission

No public utility shall issue any security, or assume any obligation or liability as guarantor, indorser, surety, or otherwise in respect of any security of another person, unless and until, and then only to the extent that, upon application by the public utility, the Commission by order authorizes such issue or assumption of liability. The Commission shall make such order only if it finds that such issue or assumption (a) is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the applicant of service as a public utility and which will not impair its ability to perform that service, and (b) is reasonably necessary or appropriate for such purposes. The provisions of this section shall be effective six months after August 26, 1935.

#### (b) Application approval or modification; supplemental orders

The Commission, after opportunity for hearing, may grant any application under this section in whole or in part, and with such modifications and upon such terms and conditions as it may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

#### (c) Compliance with order of Commission

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

#### (d) Authorization of capitalization not to exceed amount paid

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

#### (e) Notes or drafts maturing less than one year after issuance

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

#### (f) Public utility securities regulated by State not affected

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

#### (g) Guarantee or obligation on part of United States

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

#### (h) Filing duplicate reports with the Securities and Exchange Commission

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

### § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

#### (a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

#### (b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-

day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order re-

funds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by con-

tract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision".

[1] See References in Text note below.



EX. ORD. NO. 10752. DELEGATION OF FUNCTIONS TO THE SECRETARY OF THE INTERIOR

Ex. Ord. No. 10752, Feb. 12, 1958, 23 F.R. 973, provided:

SECTION 1. The Secretary of the Interior is hereby designated and appointed as the agent of the President for the execution of all the powers and functions vested in the President by the act of February 22, 1935, 49 Stat. 30, entitled ''An Act to regulate interstate and foreign commerce in petroleum and its products by prohibiting the shipment in such commerce of petroleum and its products produced in violation of State law, and for other purposes,'' as amended (15 U.S.C. 715 *et seq.*), except those vested in the President by section 4 of the act (15 U.S.C. 715c).

SEC. 2. The Secretary of the Interior may make such provisions in the Department of the Interior as he may deem appropriate to administer the said act.

SEC. 3. This Executive order supersedes Executive Order No. 6979 of February 28, 1935, Executive Order No. 7756 of December 1, 1937 (2 F.R. 2664), Executive Order No. 9732 of June 3, 1946 (11 F.R. 5985), and paragraph (q) of section 1 of Executive Order No. 10250 of June 5, 1951 (16 F.R. 5385).

DWIGHT D. EISENHOWER.

## § 715k. Saving clause

If any provision of this chapter, or the application thereof to any person or circumstance, shall be held invalid, the validity of the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby.

(Feb. 22, 1935, ch. 18, § 12, 49 Stat. 33.)

## § 715*l*. Repealed. June 22, 1942, ch. 436, 56 Stat. 381

Section, acts Feb. 22, 1935, ch. 18, § 13, 49 Stat. 33; June 14, 1937, ch. 335, 50 Stat. 257; June 29, 1939, ch. 250, 53 Stat. 927, provided for expiration of this chapter on June 30, 1942.

## § 715m. Cooperation between Secretary of the Interior and Federal and State authorities

The Secretary of the Interior, in carrying out this chapter, is authorized to cooperate with Federal and State authorities.

(June 25, 1946, ch. 472, § 3, 60 Stat. 307.)

CODIFICATION

Section was not enacted as a part of act Feb. 22, 1935, which comprises this chapter.

DELEGATION OF FUNCTIONS

Delegation of President's authority to Secretary of the Interior, see note set out under section 715j of this title.

## CHAPTER 15B—NATURAL GAS

| Sec. | |
|---|---|
| 717. | Regulation of natural gas companies. |
| 717a. | Definitions. |
| 717b. | Exportation or importation of natural gas; LNG terminals. |
| 717b–1. | State and local safety considerations. |
| 717c. | Rates and charges. |
| 717c–1. | Prohibition on market manipulation. |
| 717d. | Fixing rates and charges; determination of cost of production or transportation. |
| 717e. | Ascertainment of cost of property. |
| 717f. | Construction, extension, or abandonment of facilities. |
| 717g. | Accounts; records; memoranda. |
| 717h. | Rates of depreciation. |
| 717i. | Periodic and special reports. |
| 717j. | State compacts for conservation, transportation, etc., of natural gas. |
| 717k. | Officials dealing in securities. |
| 717l. | Complaints. |
| 717m. | Investigations by Commission. |
| 717n. | Process coordination; hearings; rules of procedure. |
| 717o. | Administrative powers of Commission; rules, regulations, and orders. |
| 717p. | Joint boards. |
| 717q. | Appointment of officers and employees. |
| 717r. | Rehearing and review. |
| 717s. | Enforcement of chapter. |
| 717t. | General penalties. |
| 717t–1. | Civil penalty authority. |
| 717t–2. | Natural gas market transparency rules. |
| 717u. | Jurisdiction of offenses; enforcement of liabilities and duties. |
| 717v. | Separability. |
| 717w. | Short title. |
| 717x. | Conserved natural gas. |
| 717y. | Voluntary conversion of natural gas users to heavy fuel oil. |
| 717z. | Emergency conversion of utilities and other facilities. |

## § 717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

### (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters

exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

**(d) Vehicular natural gas jurisdiction**

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

(1) not otherwise a natural-gas company; or

(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, §1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, §404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(a), Aug. 8, 2005, 119 Stat. 685.)

AMENDMENTS

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).

1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

Federal Power Commission terminated and functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

STATE LAWS AND REGULATIONS

Pub. L. 102–486, title IV, §404(b), Oct. 24, 1992, 106 Stat. 2879, provided that: "The transportation or sale of natural gas by any person who is not otherwise a public utility, within the meaning of State law—

"(1) in closed containers; or

"(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which

delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

## § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or



retail consumers for purposes established in accordance with State law.

[Order 697, 72 FR 40038, July 20, 2007]

### § 35.28  Non-discriminatory open access transmission tariff.

(a) *Applicability.* This section applies to any public utility that owns, controls or operates facilities used for the transmission of electric energy in interstate commerce and to any non-public utility that seeks voluntary compliance with jurisdictional transmission tariff reciprocity conditions.

(b) *Definitions*—(1) *Requirements service agreement* means a contract or rate schedule under which a public utility provides any portion of a customer's bundled wholesale power requirements.

(2) *Economy energy coordination agreement* means a contract, or service schedule thereunder, that provides for trading of electric energy on an "if, as and when available" basis, but does not require either the seller or the buyer to engage in a particular transaction.

(3) *Non-economy energy coordination agreement* means any non-requirements service agreement, except an economy energy coordination agreement as defined in paragraph (b)(2) of this section.

(4) *Demand response* means a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy.

(5) *Demand response resource* means a resource capable of providing demand response.

(6) *An operating reserve shortage* means a period when the amount of available supply falls short of demand plus the operating reserve requirement.

(7) *Market Monitoring Unit* means the person or entity responsible for carrying out the market monitoring functions that the Commission has ordered Commission-approved independent system operators and regional transmission organizations to perform.

(8) *Market Violation* means a tariff violation, violation of a Commission-approved order, rule or regulation, market manipulation, or inappropriate dispatch that creates substantial concerns regarding unnecessary market inefficiencies.

(9) *Electric storage resource* as used in this section means a resource capable of receiving electric energy from the grid and storing it for later injection of electric energy back to the grid.

(c) *Non-discriminatory open access transmission tariffs.* (1) Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce must have on file with the Commission an open access transmission tariff of general applicability for transmission services, including ancillary services, over such facilities. Such tariff must be the *pro forma* tariff promulgated by the Commission, as amended from time to time, or such other tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) Subject to the exceptions in paragraphs (c)(1)(ii), (c)(1)(iii), (c)(1)(iv), and (c)(1)(v) of this section, the open access transmission tariff, which tariff must be the *pro forma* tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff, and accompanying rates must be filed no later than 60 days prior to the date on which a public utility would engage in a sale of electric energy at wholesale in interstate commerce or in the transmission of electric energy in interstate commerce.

(ii) If a public utility owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, it must file the revisions to its open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff, pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(iii) If a public utility owns, controls, or operates transmission facilities used for the transmission of electric energy in interstate commerce, such facilities are jointly owned with a non-public utility, and the joint ownership contract prohibits transmission service

over the facilities to third parties, the public utility with respect to access over the public utility's share of the jointly owned facilities must file the revisions to its open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(iv) Any public utility whose transmission facilities are under the independent control of a Commission-approved ISO or RTO may satisfy its obligation under paragraph (c)(1) of this section, with respect to such facilities, through the open access transmission tariff filed by the ISO or RTO.

(v) If a public utility obtains a waiver of the tariff requirement pursuant to paragraph (d) of this section, it does not need to file the open access transmission tariff required by this section.

(vi) Any public utility that seeks a deviation from the *pro forma* tariff promulgated by the Commission, as amended from time to time, must demonstrate that the deviation is consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(vii) Each public utility's open access transmission tariff must include the standards incorporated by reference in part 38 of this chapter.

(2) Subject to the exceptions in paragraphs (c)(2)(i) and (c)(3)(iii) of this section, every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, and that uses those facilities to engage in wholesale sales and/or purchases of electric energy, or unbundled retail sales of electric energy, must take transmission service for such sales and/or purchases under the open access transmission tariff filed pursuant to this section.

(i) For sales of electric energy pursuant to a requirements service agreement executed on or before July 9, 1996, this requirement will not apply unless separately ordered by the Commission. For sales of electric energy pursuant to a bilateral economy energy coordination agreement executed on or before July 9, 1996, this requirement is effective on December 31, 1996. For sales of electric energy pursuant to a bilateral non-economy energy coordination agreement executed on or before July 9, 1996, this requirement will not apply unless separately ordered by the Commission.

(ii) [Reserved]

(3) Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, and that is a member of a power pool, public utility holding company, or other multi-lateral trading arrangement or agreement that contains transmission rates, terms or conditions, must have on file a joint pool-wide or system-wide open access transmission tariff, which tariff must be the *pro forma* tariff promulgated by the Commission, as amended from time to time, or such other open access transmission tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) For any power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed after October 11, 2011, this requirement is effective on the date that transactions begin under the arrangement or agreement.

(ii) For any power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed on or before May 14, 2007, a public utility member of such power pool, public utility holding company or other multi-lateral arrangement or agreement that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce must file the revisions to its joint pool-wide or system-wide open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in

317

accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(iii) A public utility member of a power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed on or before July 9, 1996 must take transmission service under a joint pool-wide or system-wide open access transmission tariff filed pursuant to this section for wholesale trades among the pool or system members.

(4) Consistent with paragraph (c)(1) of this section, every Commission-approved ISO or RTO must have on file with the Commission an open access transmission tariff of general applicability for transmission services, including ancillary services, over such facilities. Such tariff must be the *pro forma* tariff promulgated by the Commission, as amended from time to time, or such other tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) Subject to paragraph (c)(4)(ii) of this section, a Commission-approved ISO or RTO must file the revisions to its open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(ii) If a Commission-approved ISO or RTO can demonstrate that its existing open access transmission tariff is consistent with or superior to the *pro forma* tariff promulgated by the Commission, as amended from time to time, the Commission-approved ISO or RTO may instead set forth such demonstration in its filing pursuant to section 206 in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(d) *Waivers.* (1) A public utility subject to the requirements of this section

and 18 CFR parts 37 (Open Access Same-Time Information System) and 358 (Standards of Conduct for Transmission Providers) may file a request for waiver of all or part of such requirements for good cause shown. Except as provided in paragraph (f) of this section, an application for waiver must be filed no later than 60 days prior to the time the public utility would have to comply with the requirement.

(2) The requirements of this section, 18 CFR parts 37 (Open Access Same-Time Information System) and 358 (Standards of Conduct for Transmission Providers) are waived for any public utility that is or becomes subject to such requirements solely because it owns, controls, or operates Interconnection Customer's Interconnection Facilities, in whole or in part, as that term is defined in the standard generator interconnection procedures and agreements referenced in paragraph (f) of this section, or comparable jurisdictional interconnection facilities that are the subject of interconnection agreements other than the standard generator interconnection procedures and agreements referenced in paragraph (f) of this section, if the entity that owns, operates, or controls such facilities either sells electric energy, or files a statement with the Commission that it commits to comply with and be bound by the obligations and procedures applicable to electric utilities under section 210 of the Federal Power Act.

(i) The waivers referenced in this paragraph (d)(2) shall be deemed to be revoked as of the date the public utility ceases to satisfy the qualifications of this paragraph (d)(2), and may be revoked by the Commission if the Commission determines that it is in the public interest to do so. After revocation of its waivers, the public utility must comply with the requirements that had been waived within 60 days of revocation.

(ii) Any eligible entity that seeks interconnection or transmission services with respect to the interconnection facilities for which a waiver is in effect pursuant to this paragraph (d)(2) may follow the procedures in sections 210, 211, and 212 of the Federal Power Act, 18 CFR 2.20, and 18 CFR part 36. In

any proceeding pursuant to this paragraph (d)(2)(ii):

(A) The Commission will consider it to be in the public interest to grant priority rights to the owner and/or operator of interconnection facilities specified in this paragraph (d)(2) to use capacity thereon when such owner and/or operator can demonstrate that it has specific plans with milestones to use such capacity to interconnect its or its affiliate's future generation projects.

(B) For the first five years after the commercial operation date of the interconnection facilities specified in this paragraph (d)(2), the Commission will apply the rebuttable presumption that the owner and/or operator of such facilities has definitive plans to use the capacity thereon, and it is thus in the public interest to grant priority rights to the owner and/or operator of such facilities to use capacity thereon.

(e) *Non-public utility procedures for tariff reciprocity compliance.* (1) A non-public utility may submit an open access transmission tariff and a request for declaratory order that its voluntary transmission tariff meets the requirements of Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) Any submittal and request for declaratory order submitted by a non-public utility will be provided an NJ (non-jurisdictional) docket designation.

(ii) If the submittal is found to be an acceptable open access transmission tariff, an applicant in a Federal Power Act (FPA) section 211 or 211A proceeding against the non-public utility shall have the burden of proof to show why service under the open access transmission tariff is not sufficient and why a section 211 or 211A order should be granted.

(2) A non-public utility may file a request for waiver of all or part of the reciprocity conditions contained in a public utility open access transmission tariff, for good cause shown. An application for waiver may be filed at any time.

(f) *Standard generator interconnection procedures and agreements.* (1) Every public utility that is required to have on file a non-discriminatory open access transmission tariff under this section must amend such tariff by adding the standard interconnection procedures and agreement and the standard small generator interconnection procedures and agreement required by Commission rulemaking proceedings promulgating and amending such interconnection procedures and agreements, or such other interconnection procedures and agreements as may be required by Commission rulemaking proceedings promulgating and amending the standard interconnection procedures and agreement and the standard small generator interconnection procedures and agreement.

(i) Any public utility that seeks a deviation from the standard interconnection procedures and agreement or the standard small generator interconnection procedures and agreement required by Commission rulemaking proceedings promulgating and amending such interconnection procedures and agreements, must demonstrate that the deviation is consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending such interconnection procedures and agreements.

(ii)–(iv) [Reserved]

(2) The non-public utility procedures for tariff reciprocity compliance described in paragraph (e) of this section are applicable to the standard interconnection procedures and agreements.

(3) A public utility subject to the requirements of this paragraph (f) may file a request for waiver of all or part of the requirements of this paragraph (f), for good cause shown.

(g) *Tariffs and operations of Commission-approved independent system operators and regional transmission organizations*—(1) *Demand response and pricing*—(i) *Ancillary services provided by demand response resources.* (A) Every Commission-approved independent system operator or regional transmission organization that operates organized markets based on competitive bidding for energy imbalance, spinning reserves, supplemental reserves, reactive power and voltage control, or regulation and frequency response ancillary services (or its functional equivalent in the Commission-approved independent

system operator's or regional transmission organization's tariff) must accept bids from demand response resources in these markets for that product or a basis comparable to any other resources, if the demand response resource meets the necessary technical requirements under the tariff, and submits a bid under the Commission-approved independent system operator's or regional transmission organization's bidding rules at or below the market-clearing price, unless not permitted by the laws or regulations of the relevant electric retail regulatory authority.

(B) Each Commission-approved independent system operator or regional transmission organization must allow providers of a demand response resource to specify the following in their bids:

(1) A maximum duration in hours that the demand response resource may be dispatched;

(2) A maximum number of times that the demand response resource may be dispatched during a day; and

(3) A maximum amount of electric energy reduction that the demand response resource may be required to provide either daily or weekly.

(ii) *Removal of deviation charges.* A Commission-approved independent system operator or regional transmission organization with a tariff that contains a day-ahead and a real-time market may not assess charge to a purchaser of electric energy in its day-ahead market for purchasing less power in the real-time market during a real-time market period for which the Commission-approved independent system operator or regional transmission organization declares an operating reserve shortage or makes a generic request to reduce load to avoid an operating reserve shortage.

(iii) *Aggregation of retail customers.* Each Commission-approved independent system operator and regional transmission organization must accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, and the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal

year, where the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers. An independent system operator or regional transmission organization must not accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, where the relevant electric retail regulatory authority prohibits such customers' demand response to be bid into organized markets by an aggregator of retail customers, or the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, unless the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers.

(iv) *Price formation during periods of operating reserve shortage.* (A) Each Commission-approved independent system operator and regional transmission organization must modify its market rules to allow the market-clearing price during periods of operating reserve shortage to reach a level that rebalances supply and demand so as to maintain reliability while providing sufficient provisions for mitigating market power. Each Commission-approved independent system operator and regional transmission organization must trigger shortage pricing for any interval in which a shortage of energy or operating reserves is indicated during the pricing of resources for that interval.

(B) A Commission-approved independent system operator or regional transmission organization may phase in this modification of its market rules.

(v) *Demand response compensation in energy markets.* Each Commission-approved independent system operator or regional transmission organization that has a tariff provision permitting demand response resources to participate as a resource in the energy market by reducing consumption of electric energy from their expected levels in response to price signals must:

(A) Pay to those demand response resources the market price for energy for these reductions when these demand response resources have the capability to balance supply and demand and when payment of the market price for energy to these resources is cost-effective as determined by a net benefits test accepted by the Commission;

(B) Allocate the costs associated with demand response compensation proportionally to all entities that purchase from the relevant energy market in the area(s) where the demand response reduces the market price for energy at the time when the demand response resource is committed or dispatched.

(vi) *Settlement intervals.* Each Commission-approved independent system operator and regional transmission organization must settle energy transactions in its real-time markets at the same time interval it dispatches energy, must settle operating reserves transactions in its real-time markets at the same time interval it prices operating reserves, and must settle intertie transactions at the same time interval it schedules intertie transactions.

(2) *Long-term power contracting in organized markets.* Each Commission-approved independent system operator or regional transmission organization must provide a portion of its Web site for market participants to post offers to buy or sell power on a long-term basis.

(3) *Market monitoring policies.* (i) Each Commission-approved independent system operator or regional transmission organization must modify its tariff provisions governing its Market Monitoring Unit to reflect the directives provided in OrderNo. 719, including the following:

(A) Each Commission-approved independent system operator or regional transmission organization must include in its tariff a provision to provide its Market Monitoring Unit access to Commission-approved independent system operator and regional transmission organization market data, resources and personnel to enable the MarketMonitoring Unit to carry out its functions.

(B) The tariff provision must provide the Market Monitoring Unit complete access to the Commission-approved independent system operator's and regional transmission organization's databases of market information.

(C) The tariff provision must provide that any data created by the Market Monitoring Unit, including, but not limited to, reconfiguring of the Commission-approved independent system operator's and regional transmission organization's data, will be kept within the exclusive control of the Market Monitoring Unit.

(D) The Market Monitoring Unit must report to the Commission-approved independent system operator's or regional transmission organization's board of directors, with its management members removed, or to an independent committee of the Commission-approved independent system operator's or regional transmission organization's board of directors. A Commission-approved independent system operator or regional transmission organization that has both an internal Market Monitoring Unit and an external Market Monitoring Unit may permit the internal Market Monitoring Unit to report to management and the external Market Monitoring Unit to report to the Commission-approved independent system operator's or regional transmission organization's board of directors with its management members removed, or to an independent committee of the Commission-approved independent system operator or regional transmission organization board of directors. If the internal market monitor is responsible for carrying out any or all of the core Market Monitoring Unit functions identified in paragraph (g)(3)(ii) of this section, the internal market monitor must report to the independent system operator's or regional transmission organization's board of directors.

(E) A Commission-approved independent system operator or regional transmission organization may not alter the reports generated by the Market Monitoring Unit, or dictate the conclusions reached by the Market Monitoring Unit.

(F) Each Commission-approved independent system operator or regional transmission organization must consolidate the core Market Monitoring

Unit provisions into one section of its tariff. Each independent system operator or regional transmission organization must include a mission statement in the introduction to the Market Monitoring Unit provisions that identifies the Market Monitoring Unit's goals, including the protection of consumers and market participants by the identification and reporting of market design flaws and market power abuses.

(ii) *Core Functions of Market Monitoring Unit.* The Market Monitoring Unit must perform the following core functions:

(A) Evaluate existing and proposed market rules, tariff provisions and market design elements and recommend proposed rule and tariff changes to the Commission-approved independent system operator or regional transmission organization, to the Commission's Office of Energy Market Regulation staff and to other interested entities such as state commissions and market participants, provided that:

(*1*) The Market Monitoring Unit is not to effectuate its proposed market design itself, and

(*2*) The Market Monitoring Unit must limit distribution of its identifications and recommendations to the independent system operator or regional transmission organization and to Commission staff in the event it believes broader dissemination could lead to exploitation, with an explanation of why further dissemination should be avoided at that time.

(B) Review and report on the performance of the wholesale markets to the Commission-approved independent system operator or regional transmission organization, the Commission, and other interested entities such as state commissions and market participants, on at least a quarterly basis and submit a more comprehensive annual state of the market report. The Market Monitoring Unit may issue additional reports as necessary.

(C) Identify and notify the Commission's Office of Enforcement staff of instances in which a market participant's or the Commission-approved independent system operator's or regional transmission organization's behavior may require investigation, including, but not limited to, suspected Market Violations.

(iii) *Tariff administration and mitigation* (A) A Commission-approved independent system operator or regional transmission organization may not permit its Market Monitoring Unit, whether internal or external, to participate in the administration of the Commission-approved independent system operator's or regional transmission organization's tariff or, except as provided in paragraph (g)(3)(iii)(D) of this section, to conduct prospective mitigation.

(B) A Commission-approved independent system operator or regional transmission organization may permit its Market Monitoring Unit to provide the inputs required for the Commission-approved independent system operator or regional transmission organization to conduct prospective mitigation, including, but not limited to, reference levels, identification of system constraints, and cost calculations.

(C) A Commission-approved independent system operator or regional transmission organization may allow its Market Monitoring Unit to conduct retrospective mitigation.

(D) A Commission-approved independent system operator or regional transmission organization with a hybrid Market Monitoring Unit structure may permit its internal market monitor to conduct prospective and/or retrospective mitigation, in which case it must assign to its external market monitor the responsibility and the tools to monitor the quality and appropriateness of the mitigation.

(E) Each Commission-approved independent system operator or regional transmission organization must identify in its tariff the functions the Market Monitoring Unit will perform and the functions the Commission-approved independent system operator or regional transmission organization will perform.

(iv) *Protocols on Market Monitoring Unit referrals to the Commission of suspected violations.* (A) A Market Monitoring Unit is to make a non-public referral to the Commission in all instances where the Market Monitoring Unit has reason to believe that a Market Violation has occurred. While the

Market Monitoring Unit need not be able to prove that a Market Violation has occurred, the Market Monitoring Unit is to provide sufficient credible information to warrant further investigation by the Commission. Once the Market Monitoring Unit has obtained sufficient credible information to warrant referral to the Commission, the Market Monitoring Unit is to immediately refer the matter to the Commission and desist from independent action related to the alleged Market Violation. This does not preclude the Market Monitoring Unit from continuing to monitor for any repeated instances of the activity by the same or other entities, which would constitute new Market Violations. The Market Monitoring Unit is to respond to requests from the Commission for any additional information in connection with the alleged Market Violation it has referred.

(B) All referrals to the Commission of alleged Market Violations are to be in writing, whether transmitted electronically, by fax, mail, or courier. The Market Monitoring Unit may alert the Commission orally in advance of the written referral.

(C) The referral is to be addressed to the Commission's Director of the Office of Enforcement, with a copy also directed to both the Director of the Office of Energy Market Regulation and the General Counsel.

(D) The referral is to include, but need not be limited to, the following information.

(*1*) The name[s] of and, if possible, the contact information for, the entity[ies] that allegedly took the action[s] that constituted the alleged Market Violation[s];

(*2*) The date[s] or time period during which the alleged Market Violation[s] occurred and whether the alleged wrongful conduct is ongoing;

(*3*) The specific rule or regulation, and/or tariff provision, that was allegedly violated, or the nature of any inappropriate dispatch that may have occurred;

(*4*) The specific act[s] or conduct that allegedly constituted the Market Violation;

(*5*) The consequences to the market resulting from the acts or conduct, including, if known, an estimate of economic impact on the market;

(*6*) If the Market Monitoring Unit believes that the act[s] or conduct constituted a violation of the anti-manipulation rule of Part 1c, a description of the alleged manipulative effect on market prices, market conditions, or market rules;

(*7*) Any other information the Market Monitoring Unit believes is relevant and may be helpful to the Commission.

(E) Following a referral to the Commission, the Market Monitoring Unit is to continue to notify and inform the Commission of any information that the Market Monitoring Unit learns of that may be related to the referral, but the Market Monitoring Unit is not to undertake any investigative steps regarding the referral except at the express direction of the Commission or Commission Staff.

(v) *Protocols on Market Monitoring Unit Referrals to the Commission of Perceived Market Design Flaws and Recommended Tariff Changes.* (A) A Market Monitoring Unit is to make a referral to the Commission in all instances where the Market Monitoring Unit has reason to believe market design flaws exist that it believes could effectively be remedied by rule or tariff changes. The Market Monitoring Unit must limit distribution of its identifications and recommendations to the independent system operator or regional transmission organization and to the Commission in the event it believes broader dissemination could lead to exploitation, with an explanation of why further dissemination should be avoided at that time.

(B) All referrals to the Commission relating to perceived market design flaws and recommended tariff changes are to be in writing, whether transmitted electronically, by fax, mail, or courier. The Market Monitoring Unit may alert the Commission orally in advance of the written referral.

(C) The referral should be addressed to the Commission's Director of the Office of Energy Market Regulation, with copies directed to both the Director of the Office of Enforcement and the General Counsel.

(D) The referral is to include, but need not be limited to, the following information.

(*1*) A detailed narrative describing the perceived market design flaw[s];

(*2*) The consequences of the perceived market design flaw[s], including, if known, an estimate of economic impact on the market;

(*3*) The rule or tariff change(s) that the Market Monitoring Unit believes could remedy the perceived market design flaw;

(*4*) Any other information the Market Monitoring Unit believes is relevant and may be helpful to the Commission.

(E) Following a referral to the Commission, the Market Monitoring Unit is to continue to notify and inform the Commission of any additional information regarding the perceived market design flaw, its effects on the market, any additional or modified observations concerning the rule or tariff changes that could remedy the perceived design flaw, any recommendations made by the Market Monitoring Unit to the regional transmission organization or independent system operator, stakeholders, market participants or state commissions regarding the perceived design flaw, and any actions taken by the regional transmission organization or independent system operator regarding the perceived design flaw.

(vi) *Market Monitoring Unit ethics standards.* Each Commission-approved independent system operator or regional transmission organization must include in its tariff ethical standards for its Market Monitoring Unit and the employees of its Market Monitoring Unit. At a minimum, the ethics standards must include the following requirements:

(A) The Market Monitoring Unit and its employees must have no material affiliation with any market participant or affiliate.

(B) The Market Monitoring Unit and its employees must not serve as an officer, employee, or partner of a market participant.

(C) The Market Monitoring Unit and its employees must have no material financial interest in any market participant or affiliate with potential exceptions for mutual funds and non-directed investments.

(D) The Market Monitoring Unit and its employees must not engage in any market transactions other than the performance of their duties under the tariff.

(E) The Market Monitoring Unit and its employees must not be compensated, other than by the Commission-approved independent system operator or regional transmission organization that retains or employs it, for any expert witness testimony or other commercial services, either to the Commission-approved independent system operator or regional transmission organization or to any other party, in connection with any legal or regulatory proceeding or commercial transaction relating to the Commission-approved independent system operator or regional transmission organization or to the Commission-approved independent system operator's or regional transmission organization's markets.

(F) The Market Monitoring Unit and its employees may not accept anything of value from a market participant in excess of a *de minimis* amount.

(G) The Market Monitoring Unit and its employees must advise a supervisor in the event they seek employment with a market participant, and must disqualify themselves from participating in any matter that would have an effect on the financial interest of the market participant.

(4) *Electronic delivery of data.* Each Commission-approved regional transmission organization and independent system operator must electronically deliver to the Commission, on an ongoing basis and in a form and manner consistent with its own collection of data and in a form and manner acceptable to the Commission, data related to the markets that the regional transmission organization or independent system operator administers.

(5) *Offer and bid data.* (i) Unless a Commission-approved independent system operator or regional transmission organization obtains Commission approval for a different period, each Commission-approved independent system operator and regional transmission organization must release its offer and bid data within three months.

324

(ii) A Commission-approved independent system operator or regional transmission organization must mask the identity of market participants when releasing offer and bid data. The Commission-approved independent system operators and regional transmission organization may propose a time period for eventual unmasking.

(6) *Responsiveness of Commission-approved independent system operators and regional transmission organizations.* Each Commission-approved independent system operator or regional transmission organization must adopt business practices and procedures that achieve Commission-approved independent system operator and regional transmission organization board of directors' responsiveness to customers and other stakeholders and satisfy the following criteria:

(i) *Inclusiveness.* The business practices and procedures must ensure that any customer or other stakeholder affected by the operation of the Commission-approved independent system operator or regional transmission organization, or its representative, is permitted to communicate the customer's or other stakeholder's views to the independent system operator's or regional transmission organization's board of directors;

(ii) *Fairness in balancing diverse interests.* The business practices and procedures must ensure that the interests of customers or other stakeholders are equitably considered, and that deliberation and consideration of Commission-approved independent system operator's and regional transmission organization's issues are not dominated by any single stakeholder category;

(iii) *Representation of minority positions.* The business practices and procedures must ensure that, in instances where stakeholders are not in total agreement on a particular issue, minority positions are communicated to the Commission-approved independent system operator's and regional transmission organization's board of directors at the same time as majority positions; and

(iv) *Ongoing responsiveness.* The business practices and procedures must provide for stakeholder input into the Commission-approved independent system operator's or regional transmission organization's decisions as well as mechanisms to provide feedback to stakeholders to ensure that information exchange and communication continue over time.

(7) *Compliance filings.* All Commission-approved independent system operators and regional transmission organizations must make a compliance filing with the Commission as described in Order No. 719 under the following schedule:

(i) The compliance filing addressing the accepting of bids from demand response resources in markets for ancillary services on a basis comparable to other resources, removal of deviation charges, aggregation of retail customers, shortage pricing during periods of operating reserve shortage, long-term power contracting in organized markets, Market Monitoring Units, Commission-approved independent system operators' and regional transmission organizations' board of directors' responsiveness, and reporting on the study of the need for further reforms to remove barriers to comparable treatment of demand response resources must be submitted on or before April 28, 2009.

(ii) A public utility that is approved as a regional transmission organization under §35.34, or that is not approved but begins to operate regional markets for electric energy or ancillary services after December 29, 2008, must comply with Order No. 719 and the provisions of paragraphs (g)(1) through (g)(5) of this section before beginning operations.

(8) *Frequency regulation compensation in ancillary services markets.* Each Commission-approved independent system operator or regional transmission organization that has a tariff that provides for the compensation for frequency regulation service must provide such compensation based on the actual service provided, including a capacity payment that includes the marginal unit's opportunity costs and a payment for performance that reflects the quantity of frequency regulation service provided by a resource when the resource is accurately following the dispatch signal.

325

(9) *Electric storage resources.* (i) Each Commission-approved independent system operator and regional transmission organization must have tariff provisions providing a participation model for electric storage resources that:

(A) Ensures that a resource using the participation model for electric storage resources in an independent system operator or regional transmission organization market is eligible to provide all capacity, energy, and ancillary services that it is technically capable of providing;

(B) Ensures that a resource using the participation model for electric storage resources can be dispatched and can set the wholesale market clearing price as both a wholesale seller and wholesale buyer consistent with rules that govern the conditions under which a resource can set the wholesale price;

(C) Accounts for the physical and operational characteristics of electric storage resources through bidding parameters or other means; and

(D) Establishes a minimum size requirement for resources using the participation model for electric storage resources that does not exceed 100 kW.

(ii) The sale of electric energy from an independent system operator or regional transmission organization market to an electric storage resource that the resource then resells back to that market must be at the wholesale locational marginal price.

(10) *Transparency*—(i) *Uplift reporting.* Each Commission-approved independent system operator or regional transmission organization must post two reports, at minimum, regarding uplift on a publicly accessible portion of its website. First, each Commission-approved independent system operator or regional transmission organization must post uplift, paid in dollars, and categorized by transmission zone, day, and uplift category. Transmission zone shall be defined as the geographic area that is used for the local allocation of charges. Transmission zones with fewer than four resources may be aggregated with one or more neighboring transmission zones, until each aggregated zone contains at least four resources, and reported collectively. This report shall be posted within 20 calendar days

of the end of each month. Second, each Commission-approved independent system operator or regional transmission organization must post the resource name and the total amount of uplift paid in dollars aggregated across the month to each resource that received uplift payments within the calendar month. This report shall be posted within 90 calendar days of the end of each month.

(ii) *Reporting Operator-Initiated Commitments.* Each Commission-approved independent system operator or regional transmission organization must post a report of each operator-initiated commitment listing the size of the commitment, transmission zone, commitment reason, and commitment start time on a publicly accessible portion of its website within 30 calendar days of the end of each month. Transmission zone shall be defined as a geographic area that is used for the local allocation of charges. Commitment reasons shall include, but are not limited to, system-wide capacity, constraint management, and voltage support.

(iii) *Transmission constraint penalty factors.* Each Commission-approved independent system operator or regional transmission organization must include, in its tariff, its transmission constraint penalty factor values; the circumstances, if any, under which the transmission constraint penalty factors can set locational marginal prices; and the procedure, if any, for temporarily changing the transmission constraint penalty factor values. Any procedure for temporarily changing transmission constraint penalty factor values must provide for notice of the change to market participants.

(11) A resource's incremental energy offer must be capped at the higher of $1,000/MWh or that resource's cost-based incremental energy offer. For the purpose of calculating Locational Marginal Prices, Regional Transmission Organizations and Independent System Operators must cap cost-based incremental energy offers at $2,000/MWh. The actual or expected costs underlying a resource's cost-based incremental energy offer above $1,000/MWh must be verified before that offer can

326

be used for purposes of calculating Locational Marginal Prices. If a resource submits an incremental energy offer above $1,000/MWh and the actual or expected costs underlying that offer cannot be verified before the market clearing process begins, that offer may not be used to calculate Locational Marginal Prices and the resource would be eligible for a make-whole payment if that resource is dispatched and the resource's actual costs are verified after-the-fact. A resource would also be eligible for a make-whole payment if it is dispatched and its verified cost-based incremental energy offer exceeds $2,000/MWh. All resources, regardless of type, are eligible to submit cost-based incremental energy offers in excess of $1,000/MWh.

[Order 888, 61 FR 21693, May 10, 1996]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 35.28, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

### § 35.29 Treatment of special assessments levied under the Atomic Energy Act of 1954, as amended by Title XI of the Energy Policy Act of 1992.

The costs that public utilities incur relating to special assessments under the Atomic Energy Act of 1954, as amended by the Energy Policy Act of 1992, are costs that may be reflected in jurisdictional rates. Public utilities seeking to recover the costs incurred relating to special assessments shall comply with the following procedures.

(a) *Fuel adjustment clauses.* In computing the Account 518 cost of nuclear fuel pursuant to § 35.14(a)(6), utilities seeking to recover the costs of special assessments through their fuel adjustment clauses shall:

(1) Deduct any expenses associated with special assessments included in Account 518;

(2) Add to Account 518 one-twelfth of any payments made for special assessments within the 12-month period ending with the current month; and

(3) Deduct from Account 518 one-twelfth of any refunds of payments made for special assessments received within the 12-month period ending with the current month that is received

from the Federal government because the public utility has contested a special assessment or overpaid a special assessment.

(b) *Cost of service data requirements.* Public utilities filing rate applications under §§ 35.12 or 35.13 (regardless of whether the utility elects the abbreviated, unadjusted Period I, adjusted Period I, or Period II cost support requirements) must submit cost data that is computed in accordance with the requirements specified in paragraphs (a) (1), (2) and (3) of this section.

(c) *Formula rates.* Public utilities with formula rates on file that provide for the automatic recovery of nuclear fuel costs must reflect the costs of special assessments in accordance with the requirements specified in paragraphs (a) (1), (2) and (3) of this section.

[Order 557, 58 FR 51221, Oct. 1, 1993. Redesignated by Order 888, 61 FR 21692, May 10, 1996]

### Subpart D—Procedures and Requirements for Public Utility Sales of Power to Bonneville Power Administration Under Northwest Power Act

AUTHORITY: Federal Power Act, 16 U.S.C. 792–828c (1976 and Supp. IV 1980) and Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. 830–839h (Supp. IV (1980)).

### § 35.30 General provisions.

(a) *Applicability.* This subpart applies to any sales of electric power subject to the Commission's jurisdiction under Part II of the Federal Power Act from public utilities to the Administrator of the Bonneville Power Administration (BPA) at the average system cost (ASC) of that utility's resources (electric power generation by the utility) pursuant to section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. 830–839h. The ASC is determined by BPA in accordance with 18 CFR part 301.

(b) *Effectiveness of rates.* (1) During the period between the date of BPA's determination of ASC and the date of the final order issued by the Commission, the utility may charge the rate based on the ASC determined by BPA, subject to § 35.31(c) of this part.

327

**National Association of Regulatory**                    **Docket Nos. RM16-23**
  **Utility Commissioners, et al. v. FERC**                          **AD16-20**
**D.C. Cir. Nos. 19-1142 and 19-1147**


## CERTIFICATE OF SERVICE


In accordance with Fed. R. App. P. 25(d), and the Court's

Administrative Order Regarding Electronic Case Filing, I hereby certify

that I have, this 31st day of January 2020, served the foregoing upon

the counsel listed in the Service Preference Report via email through

the Court's CM/ECF system.


/s/ *Jared B. Fish*
Jared B. Fish
Attorney


Federal Energy Regulatory
  Commission
Washington, DC 20426
Telephone: (202) 502-8101
Fax: (202) 273-0901
Email: jared.fish@ferc.gov